Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/02/2023 09:07 AM CDT

State of Nebraska, appellee, v.
Ross S. Lorello III, appellant.
___ N.W.2d___

Filed June 2, 2023.    No. S-22-412.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.

5. **Trial: Rules of Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.

6. **Evidence: Proof.** The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.

7. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct

appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

Jerry M. Hug, of Hug & Jacobs, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Matthew Lewis for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Ross S. Lorello III appeals after he was convicted and sentenced for first degree murder and use of a deadly weapon to commit a felony. At Lorello's jury trial, various forms of circumstantial evidence connected him to the shooting death of a real estate agent whose body was found at a house the agent had shown to Lorello the previous day. On appeal, Lorello claims that the district court erred in admitting an exhibit that included a split-screen video showing slowed footage of an individual, whom no witness had identified at trial, walking, alongside slowed footage of Lorello walking. Lorello argues that the evidence was irrelevant and unfairly prejudicial. He also asserts that the evidence at trial was insufficient to support his convictions. And Lorello contends that his trial counsel was ineffective in failing to investigate juror interactions with members of the victim's family. Finding no error, we affirm.

BACKGROUND

Not long after real estate agent Michael Sodoro was reported missing, law enforcement found his body concealed in a rental house he had shown to Lorello the day before.

Sodoro had died from a single gunshot wound to the back of the head. The State charged Lorello with first degree murder and use of a deadly weapon to commit a felony. See Neb. Rev. Stat. §§ 28-303 and 28-1205 (Reissue 2016). Lorello was tried before a jury.

*Lorello and Sodoro Meet at Rental House.*

Evidence at Lorello's jury trial established that Lorello and his ex-girlfriend had two young children and were residing temporarily with the ex-girlfriend's father. The family had previously been evicted multiple times, and Lorello's credit issues had prevented him from leasing a residence.

Sodoro was an experienced real estate agent who had listed a rental house that his son had recently purchased. Sodoro and Lorello arranged to meet there for a showing at 6:15 p.m. on December 28, 2020. Lorello's ex-girlfriend testified that when Lorello, who did not have a vehicle of his own, left her father's house in her Ford Edge that day, Lorello was wearing an orange sweatshirt her father had just given him. There is no dispute that Lorello met Sodoro at the rental house as arranged.

At 6:10 p.m., around the time the meeting between Sodoro and Lorello was scheduled to occur, Sodoro spoke to Casey Freyer, the former owner of the rental house. Freyer had passed by the rental house and encountered Sodoro in his truck, parked on the street. Freyer told Sodoro that he had a spare set of keys for the rental house at his new residence nearby and left to retrieve the keys. When Freyer returned to the rental house at 6:19 p.m., he observed Sodoro's truck, still parked on the street and running, with no one inside. He also saw a small Ford sport utility vehicle parked in the driveway, and he noted partial license plate information that was consistent with the Ford Edge that Lorello drove.

Seeing lights on in the rental house, Freyer went to the front door and rang the doorbell. Freyer testified that he saw shadows and motion and heard an individual come

down the steps of the split-level rental house and pass the front door. Freyer recounted that a large man with dark hair came out through the garage to meet him and introduced himself as the new tenant; the man wore an orange sweatshirt. Other evidence at trial established that in December 2020, Lorello was a large man with dark hair. Freyer also testified that the man looked very similar to a photograph of an individual identified as Lorello that he later saw in news coverage, and Freyer identified Lorello, in court, as the person he had seen on the news.

Freyer recalled that he told the man in the orange sweatshirt he was looking for Sodoro and that the man responded that Sodoro had "jumped in another vehicle with a son's friend to go look at another property somewhere in the area." Freyer said he would wait outside for Sodoro, and the man went back inside the rental house. Freyer left after waiting for a few minutes. Freyer drove by the rental house a few more times that evening and noticed that both vehicles were gone.

Lorello's ex-girlfriend testified that Lorello arrived home later than expected. He gave her $100 and showed her a contract for a house.

*Sodoro's Body Found in Rental House.*

In the early morning hours of December 29, 2020, Sodoro's son reported Sodoro missing. Sodoro had not been heard from or seen after his scheduled meeting at the rental house. Soon after receiving the report, a law enforcement officer located Sodoro's truck a few blocks from the rental house. Law enforcement personnel also searched the house. They observed it to be extremely clean and "move-in ready," with some exceptions. In the kitchen and on the carpet of an adjacent room, they found red stains. Inside the kitchen pantry, they found an orange sweatshirt with red stains. On the floor in a bathroom, investigators found a contact lens and a button, along with red stains on the bathtub. Freyer and his wife, the previous owners of the rental house, had thoroughly cleaned

the house about 10 days before, as Sodoro had requested prior to closing. They denied seeing the red stains and leaving the orange sweatshirt, the contact lens, or the button.

An officer found Sodoro's body in the attached garage, in a crawl space underneath some steps. Partially unrolled pieces of carpet and a box of spare flooring concealed the body from view; Freyer and his wife testified that they had left the carpet neatly rolled. There was a gunshot wound on the back of Sodoro's head, consistent with being shot at close range. A contact lens was missing from Sodoro's left eye, and a button was missing from his shirt; investigators determined that these missing items were in the bathroom.

*Investigation Focuses on Lorello;*
*Lorello Makes Statements.*

Lorello waived his *Miranda* rights and was interviewed at the sheriff's office on the afternoon of December 29, 2020. Lorello initially told officers that he was the new owner of the rental house and showed them a rent-to-own agreement. Officers later discovered that Lorello had not only the tenant's copy of the agreement, but also the real estate agent's copy, which Sodoro's business associate testified "wouldn't make any sense" for a real estate transaction. The real estate agent's copy that Lorello had was in a large file folder that Sodoro's business associate testified had distinct characteristics consistent with Sodoro's method of organizing lease agreements. On each copy, Lorello's signature was on the first page, but not on the signature block on the last page.

During the interview at the sheriff's office, Lorello admitted meeting Sodoro at the rental house about 6:15 p.m. the day before to execute the rent-to-own agreement. Lorello said that he paid Sodoro about $9,700 in cash for 6 months' rent. Lorello stated that at 6:45 p.m., a couple also interested in the house arrived outside in a silver car, and Sodoro was either picked up to meet someone else or left with the couple, leaving his truck running at the rental house. Lorello told officers

that about the same time, he left. However, Lorello reported that before departing, he had a 10-minute conversation with a bearded man in a lime-green shirt, who was looking for Sodoro. At trial, Freyer testified that on December 28, 2020, he had a beard and wore a high-visibility yellow sweatshirt. Lorello claimed that the bearded man waited for Sodoro for a few minutes while Lorello locked up the house, and then left. Lorello said that shortly after, he too left, and that Sodoro's truck was still there, running.

Lorello also told officers that after leaving, he went to a QuikTrip gas station and then realized that he left the rental house without his new sweatshirt, a signature on the rental agreement, or a receipt for his rent payment. He claimed that he tried to call Sodoro to let him know, but Sodoro did not answer. Contrary to Lorello's statement, the call logs on Lorello's cell phone did not show a call to Sodoro after 6:45 p.m. Lorello said that he returned to the house, but he saw neither his sweatshirt nor any sign of Sodoro, so he left. Lorello denied ever driving Sodoro's truck, but he told officers that days before, Sodoro had driven him around the neighborhood in his truck. At some point during the interview, Lorello was informed that Sodoro had been found dead inside the rental house. Officers eventually released Lorello at his workplace.

On the night of December 29, 2020, investigators searched the house where Lorello lived with his ex-girlfriend and her father. They discovered wet clothing in the washing machine: two pairs of men's blue jeans and a long-sleeved T-shirt. The shirt was consistent with Lorello's description of the shirt he had worn the night before. Lorello's ex-girlfriend testified that this was odd, because Lorello did not typically wash his own clothes—she did, and she had not washed those clothes.

Meanwhile, during conversations on the night of December 29 and the morning of December 30, 2020, Lorello told a coworker and the coworker's fiancée that police told him that a real estate agent in the area had been shot with

a ".22." Officers testified that when these conversations occurred, the sheriff's office had not told Lorello the caliber of firearm used to shoot Sodoro, nor had that information been obtained through an autopsy or released to the press. Lorello also told them that he had an inoperable .22-caliber weapon, that police found his sweatshirt on the victim's body, that Lorello met with the agent to rent a house, that other people were present, that an argument broke out, and that Lorello was innocent. Thereafter, Lorello was arrested, and the investigation continued.

On December 30, 2020, investigators searched the Ford Edge Lorello drove to meet with Sodoro. In the cupholder of the Ford Edge, they found keys for the rental house; an additional key for the rental house was later found at Lorello's residence. In the Ford Edge's trunk area, where the spare tire was normally stored, they found a backpack that Lorello's ex-girlfriend identified as one Lorello took nearly everywhere he went. Inside the backpack they found loose .22-caliber ammunition and an identification card for "ROSS S LORELLO." Beside the backpack was a .22-caliber revolver handgun, wrapped in a towel.

The six-shot .22-caliber revolver contained five unfired cartridges and one spent shell casing, which a forensic technician for firearms concluded had been fired by that revolver. The forensic pathologist who conducted Sodoro's autopsy testified that it was possible that a .22-caliber firearm caused Sodoro's head wound, and the forensic technician for firearms opined that the bullet fragments retrieved from Sodoro's body were of the same "general or class characteristics" as the bullets she test-fired from the revolver found in the Ford Edge.

*Print and DNA Evidence.*

Investigators determined that Lorello's handprints were on the bathtub in the bathroom where Sodoro's contact lens and button were found. The fingerprint examiner testified that they also identified a print from Lorello's left index

finger "in the inside of" the interior driver's-side door handle of Sodoro's truck, which Lorello told investigators he had never driven.

Items from the investigation were also linked to Lorello and Sodoro by DNA analysis. It indicated an extremely high probability that the DNA profile found on the soles of Lorello's shoes originated from Lorello and Sodoro. DNA profiles obtained from the revolver found in the Ford Edge were linked to Lorello alone, with an extreme degree of likelihood. A sample from the bathtub bearing Lorello's prints tested positive for blood and generated a DNA profile to which Lorello was extremely likely to be the major contributor, but there was not enough information to make conclusions about the minor contributor. The neckline of the orange sweatshirt yielded a DNA profile to which Lorello and Sodoro were extremely likely to be contributors. A red stain on the orange sweatshirt tested positive for blood and produced a single-source DNA profile that was extremely likely to have originated from Sodoro.

*Navigation Data and Video*
*Surveillance Evidence.*

Investigators harvested navigation data from the Ford Edge and video surveillance footage from the area of the rental house and from the QuikTrip where Lorello had stopped. That evidence showed that the Ford Edge arrived at the rental house around 6:15 p.m., where Sodoro's truck was already parked on the street. It depicted Freyer stopping his truck next to Sodoro's truck and then leaving. At 6:16 p.m., Sodoro and an individual from the Ford Edge entered the rental house. Freyer returned and approached the rental house. The video provided a view of an individual coming out of the garage. The video showed Freyer remaining outside for a few minutes, then departing.

Surveillance video showed an individual exit the rental house and leave in Sodoro's truck. It also showed an individual,

whom no witness identified at trial, walking away from the area where Sodoro's truck was parked. The surveillance video further showed an individual approach the rental house on foot and enter it about 10 minutes after Sodoro's truck drove away. At 6:50 p.m. an individual exited the house and backed the Ford Edge into the garage. The Ford Edge left the rental house at 7:04 p.m.

The Ford Edge arrived at a QuikTrip at 7:17 p.m., where surveillance video captured footage of a man identified as Lorello by Lorello's ex-girlfriend. Next, the Ford Edge left the QuikTrip at 7:25 p.m., returned to the rental house for a short time, and then departed again. It arrived back at the QuikTrip at 7:52 p.m. The Ford Edge then traveled to another location and eventually ended up at Lorello's temporary residence.

*Objection to Video Evidence in Exhibit 364.*

Other video surveillance footage—exhibit 364—was the subject of objections by Lorello. Exhibit 364 consisted of two digital video files compiling clips from footage that the jury had already viewed.

One file in exhibit 364 showed three separate video clips in succession. All of the clips depicted video images of an individual walking. Two of them were surveillance video images from QuikTrip, identified as Lorello by Lorello's ex-girlfriend. One of the images was of an individual, whom no witness identified at trial, walking away from the area where Sodoro's truck had been parked—and later discovered by law enforcement—after being moved from the rental house shortly before.

The other file in exhibit 364 was video evidence that had been slowed by an investigator by about 50 percent. In a split screen, it compiled slowed portions of the three videos from the other file in exhibit 364 with an additional slowed video clip. The additional slowed clip depicted another view of an individual, whom no witness identified at trial, walking

away from the area where Sodoro's truck was parked and later found.

On the morning the investigator was scheduled to testify, Lorello sought to exclude exhibit 364 by claiming that it was irrelevant and that even if relevant, its probative value was outweighed by the danger of unfair prejudice. The State responded that exhibit 364 was "simply a guide for the jurors to make their own determination if this is the same individual and if the evidence as a whole shows that this is [Lorello]." The district court ruled that it would admit exhibit 364 but stated that it would not allow opinion testimony about the exhibit.

Emily Penry, the investigator who compiled the footage in exhibit 364, testified on direct examination that she used a software program to slow the split-screen videos by about 50 percent "to be able to compare it, easier to view, and then compiled it so that it's kind of in sequence." She testified that she did not create a "new video" but, rather, slowed down the speed of the "[s]ame video."

Lorello renewed his objection to exhibit 364 and lodged a continuing objection, and the district court overruled it. Exhibit 364 was received and published to the jury.

On cross-examination, Penry confirmed that she had not had "any training in walking gait" and was not "an expert in walking gait." Lorello elicited testimony that Penry did not know exactly how much she reduced the speed in each of the split-screen videos. The following exchange occurred:

> Q. The idea behind reducing those videos was to align them to one cadence, if you will, to be able to allow for the jury to review this, correct?
>
> A. Yes.
>
> . . . .
>
> [Q.] When you slowed those down, I think the idea behind it, correct me if I'm wrong, was to match like right foot, left foot, right foot, left foot in each video, correct?

A. Honestly, I was just doing it so you can kind of compare that it appears—

Q. But you would agree . . . that you did modify each and every one of those four videos from the original video that was obtained from other deputies and given to you, correct?

A. Yes.

. . . .

Q. In order to do that, you took individual videos and you've already placed them in and you were able to manipulate that in order to make the walking gait video, correct?

A. Yes. I was able to slow them down.

Q. Slow them down, okay.

On redirect, Penry clarified that she slowed down the videos, which she did not consider manipulation. She explained, "I was just basically slowing the video down to better observe the video."

*Lorello Found Guilty and Sentenced.*

The jury was instructed to decide whether Lorello had intentionally used a firearm to kill Sodoro purposely and with deliberate and premeditated malice. The jury found that he had and, accordingly, found Lorello guilty of first degree murder. It also found him guilty of use of a deadly weapon to commit a felony. The district court accepted the verdicts and sentenced Lorello to life imprisonment for the homicide and 47 to 50 years' imprisonment for the weapon offense, to be served consecutively. Represented by new counsel, Lorello filed a timely appeal.

## ASSIGNMENTS OF ERROR

Lorello assigns (1) that the district court erred in admitting as evidence "manipulated video surveillance from multiple sources in [an] attempt to match the walking pattern of the individuals in those videos to a video depicting [Lorello]

walking" and (2) that the evidence was insufficient to support his convictions of first degree murder and use of a weapon to commit a felony.

Lorello also assigns that his trial counsel was ineffective in failing to investigate his reports of a conversation in the courthouse between a juror and a member of Sodoro's family and of an instance when a member of the prosecutor's office was present for a conversation between a juror and a member of Sodoro's family.

## STANDARD OF REVIEW

[1,2] The standard we generally apply on appeal when reviewing decisions regarding issues of admissibility under the rules of evidence is as follows: In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[4] Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

## ANALYSIS

*Admissibility of Video Evidence.*

[5] Lorello claims that the district court erred in admitting exhibit 364. In particular, he challenges the admission of the split-screen portion of exhibit 364 that was slowed and that showed two video images of Lorello walking at QuikTrip alongside two video images of an individual, whom no witness identified at trial, walking away from the area where Sodoro's truck was found. The images of the unidentified individual were captured soon after the truck was moved from the rental house. As he did at trial, Lorello contends on appeal that this evidence was irrelevant and that even if it was relevant, it was unduly prejudicial. A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). On both counts, we discern no abuse of discretion.

[6] We first address relevance. Under Neb. Rev. Stat. § 27-401 (Reissue 2016), "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing. *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022). See, also, *State v. Tucker*, 301 Neb. 856, 865, 920 N.W.2d 680, 688 (2018) ("[e]vidence is relevant if it tends in any degree to alter the probability of a material fact").

Lorello's brief contends simply that "the manipulated evidence was not relevant as it was not produced to make the existence of any fact that is of consequence more or less probable." Brief for appellant at 11. At oral argument, Lorello's counsel explained, "[S]lowing the video down to try to get it to match . . . to try to [identify Lorello], which was really the purpose of the exhibit, makes it irrelevant because

they've altered it, they have taken something that didn't fit and tried to make it fit."

We understand Lorello to take the position that the slowed footage in exhibit 364 was irrelevant because it could not be probative of how Lorello and the unidentified individual truly appeared on the night of the murder. We disagree. In other exhibits, the jury viewed individually the same footage that exhibit 364 compiled and presented at approximately half speed. As Penry testified, the compiled and slowed footage in exhibit 364 was the "[s]ame video" the jury had already viewed; she had merely slowed the speed of the digital footage. The parties do not identify any meaningful difference between this and the slowing of an analog film video. Penry slowed the apparent relative movement of each video; she did not create a "new video."

Rather than making something new, Penry arranged and slowed existing footage to allow the jury a field of vision and time to compare known images of Lorello walking—by which the jury could observe his physique, clothing, and gait—to images in which the subject had not been identified. This could have aided the jury in deciding whether Lorello was the person who moved Sodoro's truck from the rental house to a location a few blocks away. A finding that Lorello had moved Sodoro's truck would have bolstered the State's theory that Lorello killed Sodoro inside the rental house and then tried to hide the crime. It would also have been inconsistent with Lorello's statement that he had never driven Sodoro's truck, thereby calling into question other statements Lorello had made, such as his claims that Sodoro conducted a routine real estate transaction with Lorello and then left the rental house with someone else. Because exhibit 364 altered the probability of material facts, we conclude that the district court did not abuse its discretion in admitting exhibit 364 over Lorello's relevancy objection.

Alternatively, Lorello claims that even if the slowed footage was relevant, it was unfairly prejudicial under Neb. Rev. Stat.

§ 27-403 (Reissue 2016), which provides for the exclusion of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice." Lorello claims that the slowed portion of exhibit 364 unfairly prejudiced him because clips of Lorello walking and of the unidentified individual walking were slowed to "match" step-for-step, to prompt an "unfounded determination" that they depicted the same person. Brief for appellant at 11.

Whether there was an effort to "match" the footage in the exact manner Lorello posits is not so clear to us. On cross-examination, Penry agreed that "[t]he idea behind reducing those videos was to align them to one cadence, if you will, to be able to allow for the jury to review this . . . ." She stopped short, however, of agreeing that "the idea behind [slowing the videos] was to match . . . right foot, left foot, right foot, left foot in each video," answering instead that she "was just doing it so you can kind of compare." But even assuming Lorello's "match" characterization of the slowed compilation in exhibit 364 is correct, we are not persuaded that it was unfairly prejudicial.

We find guidance in *Com. v. Cash*, 635 Pa. 451, 137 A.3d 1262 (2016), an opinion of the Pennsylvania Supreme Court, which rejected an argument, based on Pennsylvania's "Rule 403," that the trial court abused its discretion in admitting slow-motion video evidence. Over objection, the jury in *Cash* viewed video footage of a homicide in a first degree murder trial. The video showed the events in "real-time" speed, but certain portions were then repeated in slow motion at one-tenth speed and clearly marked "'SLOW MOTION.'" *Id.* at 475, 137 A.3d at 1275. After the video was played in its entirety, it was shown again while an expert in forensic video recovery analysis narrated to explain alterations he had made to the speed of the footage or camera angles. The trial court later instructed the jury that the video was admitted "'for the purpose of showing the nature of the wound received by the decedent, showing the conditions at the scene of the crime

and helping [them] understand the testimony of witnesses who referred to it.'" *Id.* at 476, 137 A.3d at 1276. The trial court cautioned the jurors that they "'should not let [the video] stir up [their] emotions to the prejudice of the defendant.'" *Id.*

On appeal, the court in *Cash* found no abuse of discretion in allowing the evidence. The court explained that the slow-motion portions

> enhanced the jury's understanding of the events surrounding the murder by allowing it to have a better view of Appellant's face, thereby establishing Appellant's identity as the perpetrator, and by giving it the opportunity to observe that two shots had been fired from Appellant's gun, a detail which was not readily ascertainable when the video was played at normal speed.

*Id.* at 478, 137 A.3d at 1277. The court reasoned that this probative value outweighed the potential for prejudice, because the jury had viewed the footage at normal speed, the slow-motion footage was clearly marked, and the trial court specifically instructed the jurors of the footage's limited purpose and to guard against allowing it to inflame their passions.

Similarly, in this case, there were factors that prevented the danger of unfair prejudice from substantially outweighing exhibit 364's probative value. As we have explained, the disputed portion of exhibit 364 was probative because it aided the jury in comparing known footage of Lorello at QuikTrip, including his physique, clothing, and manner of walking, to footage of the unidentified individual walking away from Sodoro's truck. As in *Cash*, before viewing the compiled and slowed clips in exhibit 364, the jury viewed the same footage individually and at "real-time" speed. *Id.* at 475, 137 A.3d at 1275. Moreover, before exhibit 364 was published, Penry explained to the jury that it was the "[s]ame video" they had seen before, with only the speed slowed to allow the jury "to be able to compare it" and to make it "easier to view." When the jury viewed exhibit 364, it was evident that the images in the split-screen portion had been slowed.

Lorello had the opportunity to cross-examine Penry about exhibit 364 and to elicit her testimony about any effort to "match" the footage step-for-step. Considering the probative value of the compiled and slowed footage and the way it was presented to the jury, we conclude that the district court did not abuse its discretion in admitting exhibit 364.

*Sufficiency of Evidence.*

We now turn to Lorello's assertion that the evidence was not sufficient to convict him of first degree murder and use of a deadly weapon to commit a felony. These convictions are based on the jury's findings that Lorello had used a firearm to kill Sodoro "purposely and with deliberate and premeditated malice." See §28-303(1). See, also, § 28-1205(1)(a). Lorello does not dispute that there was sufficient evidence to show that some person committed the elements of the crimes charged. Lorello argues only that no rational trier of fact could conclude that he was that person. We disagree.

Rather than demonstrating that the evidence presented failed to establish his identity as Sodoro's killer, Lorello claims that the absence of certain evidence rendered the jury's verdicts irrational. For example, Lorello notes that there were no eyewitnesses to the murder, that no testimony pinpointed Sodoro's time of death, and that incriminating print and DNA evidence was not found at certain locations. But our standard of review directs us to evaluate the evidence that was before the jury, not an account of potentially incriminating facts that were lacking: The relevant question is whether, after viewing the evidence presented in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022). See, also, *State v. Stack*, 307 Neb. 773, 789, 950 N.W.2d 611, 622 (2020) (rejecting notion that State must disprove every hypothesis other than guilt of defendant whose brief "t[ook] a selective view of the evidence, focuse[d] on other possible

explanations for [the victim's] death, and characterize[d] the investigation as incomplete"). Reviewed under this standard, the evidence amply supports Lorello's convictions. The State presented abundant circumstantial evidence showing that Lorello fatally shot Sodoro in an effort to secure housing and then tried to conceal what he had done.

The evidence demonstrated that Lorello was having difficulty obtaining and maintaining housing for his family. Lorello, his ex-girlfriend, and their two young children were temporarily living with the ex-girlfriend's father. Lorello, wearing an orange sweatshirt, drove his ex-girlfriend's Ford Edge to meet Sodoro for a showing of the rental house. Circumstantial evidence and Lorello's own statements to officers established that Lorello met with Sodoro as scheduled.

Shortly before the meeting, Freyer spoke to Sodoro as he sat in his truck. Testimony and neighborhood surveillance video showed that minutes after Sodoro and Lorello went inside, Freyer came to the door looking for Sodoro, whose empty truck sat running on the street. Circumstantial evidence demonstrated that Lorello came out from the rental house to speak to Freyer. Lorello told Freyer that Sodoro had left the rental house with someone else, but that account was not corroborated by surveillance footage. No one heard from Sodoro or saw him alive after he entered the rental house with Lorello.

Lorello came away from the meeting with keys for the rental house and lease paperwork that was not consistent with an ordinary real estate transaction involving Sodoro. The lease agreement was partially signed, and Lorello had an extra copy of the agreement that, in a typical transaction, would have remained with Sodoro. The extra copy was in the type of large file folder Sodoro usually used to organize his paperwork.

The day after the meeting, law enforcement found Sodoro dead inside the rental house. Physical evidence supported the State's theory that Lorello killed Sodoro there. Sodoro's

body was concealed in the attached garage, underneath partially unrolled carpet that the previous owners had left neatly rolled. He died from a single gunshot wound to the back of the head. The wound was consistent with a gunshot at close range. Inside the otherwise clean rental house, investigators found a button and a contact lens belonging to Sodoro, near handprints identified as Lorello's and blood extremely likely to contain Lorello's DNA. Investigators also found red stains on the carpet and in the kitchen. Also in the kitchen, they found an orange sweatshirt; DNA testing showed it extremely likely that Lorello's DNA was on the sweatshirt and that blood on the sweatshirt was Sodoro's. DNA, exceedingly likely to be Sodoro's, was also detected on the soles of Lorello's shoes.

Additional evidence connected Lorello to the single bullet that killed Sodoro. Investigators found a .22-caliber revolver handgun in the Ford Edge Lorello drove. The forensic pathologist who performed Sodoro's autopsy opined that it was possible Sodoro was shot with a .22-caliber firearm, and a forensic technician testified that the bullet fragments recovered from Sodoro were of the same general or class characteristics as the bullets she test-fired from the revolver discovered in the Ford Edge. That six-shot revolver contained five unfired cartridges and one spent shell casing and bore DNA that almost certainly belonged to Lorello. The revolver was found next to Lorello's backpack; inside the backpack was .22-caliber ammunition. Before investigators had uncovered any of this information, Lorello told others about a real estate agent in the area who had been killed with a ".22."

There was evidence that Lorello attempted to conceal his involvement in Sodoro's murder. Neighborhood surveillance footage did not corroborate Lorello's statements that Sodoro left the rental house with someone else or that someone else, other than Freyer, was present there. Instead, it depicted someone leaving the rental house, after Sodoro and the individual from the Ford Edge had entered it, and moving Sodoro's

truck several blocks away. The jury observed surveillance video of that person walking away on foot. Lorello denied driving Sodoro's truck, but investigators found his fingerprint "in the inside of" the interior door handle on the driver's side. Surveillance showed an individual enter the rental house, where the Ford Edge was parked, minutes later. Call logs on Lorello's cell phone did not comport with his statement to investigators that he called Sodoro after leaving the rental house to inquire about the transaction and his forgotten sweatshirt. Circumstantial evidence strongly suggested that after Lorello returned home from meeting Sodoro, he washed the clothes he had worn, a household chore he did not typically do.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that it was Lorello who used a firearm to commit first degree murder.

*Ineffective Assistance of Counsel.*

Represented by new counsel on appeal, Lorello assigns and argues that his trial counsel was ineffective in failing to investigate two reports Lorello claims to have made: (1) an occasion when a juror and members of the victim's family were conversing in the courthouse and (2) another occasion during trial where a member of the prosecutor's office was present for a conversation between a juror and a member of the victim's family. Lorello claims that these incidents occurred when he was being moved through the courthouse during trial delays and that he informed his counsel, but no action was taken. He contends that a lawyer with ordinary training and experience would have investigated his allegations.

[7] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition

for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023). We conclude that Lorello has alleged this claim with sufficient particularity, but that we are unable to resolve it upon this record.

## CONCLUSION

For the reasons explained above, we affirm the judgment of the district court.

Affirmed.