Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:09 PM CDT

State of Nebraska, appellee, v.
Donald Gene Anthony, appellant.
___ N.W.3d ___

Filed April 12, 2024.    No. S-23-130.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.

4. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

6. **Witnesses: Intoxication.** A lay witness may give an opinion as to intoxication, at least where it has been established that the witness had an opportunity to observe the person.

7. **Intoxication.** To be "under the influence" entails loss to an appreciable degree of the normal control of one's bodily and mental faculties and to the extent that there is an impairment of the capacity to think and act correctly and efficiently.

8. **Witnesses: Intoxication.** A lay witness can render an opinion regarding intoxication provided the witness first details the facts upon which the opinion is based.

9. **Witnesses.** A witness is not permitted to render an opinion based on obvious speculation or conjecture.

10. **Trial: Witnesses.** To the extent reasonably feasible, the witness ought to attempt to convey the concrete primary facts to the trier of fact.

11. ____: ____. Generally, the lay witness' opinion must be based on the witness' perception, foundation must establish a rational basis for the opinion, and the testimony must be helpful to the trier of fact.

12. **Witnesses: Intoxication.** Adequate foundation of a witness' personal knowledge is especially important with respect to drug intoxication, because the average person may have little or no experience with drugs, and it thus falls outside the realm of common experience.

13. **Witnesses.** The amount of a witness' prior experience that is sufficient for an adequate foundation should be left to the discretion of the trial judge.

14. **Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors entitle a criminal defendant to the reversal of an adverse trial result.

15. **Criminal Law: Trial: Evidence: Appeal and Error.** An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.

16. **Verdicts: Appeal and Error.** The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

17. **Trial: Convictions: Evidence: Appeal and Error.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

18. **Evidence.** Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.

19. **Self-Defense.** An unconscious adversary does not pose an imminent threat of death or serious bodily harm for purposes of a claim of self-defense that could render a defendant not guilty.

20. **Hearsay.** An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.

21. ____. Whether a particular statement is hearsay will most often hinge on the purpose for which it is offered.

22. ____. Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events.

23. ____. Statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.

24. **Hearsay: Police Officers and Sheriffs.** Statements made to law enforcement to explain the steps taken in an investigation of a defendant, rather than to prove the truth of the matter asserted, are generally admissible as nonhearsay so long as the probative value of the evidence's nonhearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by an impermissible hearsay use of the statements.

25. **Hearsay.** Statements admitted for the purpose of showing the defendant's response and state of mind are generally admissible as nonhearsay if relevant to the case and not unfairly prejudicial.

26. **Trial: Rules of Evidence: Appeal and Error.** Pursuant to Neb. Rev. Stat. § 27-103(1)(b) (Reissue 2016), error may not be predicated upon a ruling that excludes evidence, unless a substantial right of the party is affected and the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

27. **Evidence: Proof: Appeal and Error.** In the absence of an offer of proof, an appellate court may still entertain a challenge to the exclusion of evidence on appeal if the substance of the evidence was apparent from the context within which the question was asked and the evidence would have been material and competent.

28. **Trial: Evidence: Proof.** An offer of proof is frequently unnecessary where a particular answer to a leading question permits, and examining counsel obviously expects, an answer favorable to his client, or where the cross-examiner expects an unfavorable response and obviously intends to pursue a given line of inquiry.

29. **Trial: Hearsay: Appeal and Error.** A failure to object at trial to the admission of evidence on the specific grounds of hearsay bars the appellant from asserting hearsay as a ground for error by the trial court in refusing to exclude the testimony.

30. **Judgments: Appeal and Error.** An appellate court may affirm a lower court's ruling that reaches the correct result—even if the reasoning on appeal is different than the trial court's reasoning.

31. **Trial: Witnesses.** A judge is not limited to sustaining an objection to a witness' testimony solely on the ground raised by a party's objection.

32. **Judgments: Appeal and Error.** Where the court's ruling sustaining an objection to the proffered evidence was legally correct, an appellate court will not find reversible error simply because the basis for its ruling was different than that asserted by the objecting party.

33. **Confessions: Police Officers and Sheriffs.** The test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined.

34. ____: ____. An officer's telling a defendant that the officer believes what the defendant has already told the officer is not probative of whether law enforcement had overborn the defendant's will to resist making the statement.

Appeal from the District Court for Hall County: Patrick M. Lee, Judge. Affirmed.

Gerard A. Piccolo, Hall County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## INTRODUCTION

Following a jury trial, the defendant was convicted of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. On direct appeal, the defendant seeks reversal of his convictions based on evidentiary rulings made by the district court during trial. We affirm.

## BACKGROUND

On February 15, 2022, law enforcement received a phone call at 6:05 a.m. concerning an individual bleeding in an apartment building at South Pine Street in Grand Island, Nebraska (Pine Street Apartments). Shortly after arriving at 6:07 a.m., law enforcement found the individual, later

identified as Said Farah, on a staircase landing with a laceration to his neck and a pool of blood underneath his body. He was declared dead at 6:09 a.m.

Following an investigation, the State arrested and charged Donald Gene Anthony with first degree murder, a Class I felony; use of a deadly weapon to commit a felony, a Class II felony; and possession of a deadly weapon by a prohibited person, a Class III felony. The State subsequently added a habitual criminal allegation.

## Events Leading to Farah's Death

At trial, the State called several witnesses who were in the Pine Street Apartments at the time of Farah's death.

Liep Biliew lived on the second floor. He testified that several people were in his apartment in the early morning hours of February 15, 2022. Around 2 a.m., Biliew woke up and observed Farah sitting by himself on the interior stairs of the apartment building. Biliew testified he let Farah into his apartment, but that Farah left shortly thereafter.

Latifah Chandler was at Biliew's apartment on February 14 and 15, 2022. Chandler stated that Farah "was acting different, kind of off, like strange" the evening of February 14. Early in the morning on February 15, she heard people knocking on Biliew's door, people arguing in the hallway, and a dog barking. She heard a "big, loud noise as if . . . somebody had fallen off the balcony where the stairs are, maybe fallen off the stairs." She also heard the door on the east side of the apartment building close. Chandler testified that she had previously seen Marissa Stephens, Anthony's girlfriend, with her dog at Biliew's apartment and that Anthony and Stephens were in a relationship at that time.

Mohnad Hassan lived on the second floor. He testified that around 6 a.m., he heard what sounded like fighting, a woman yelling, and someone falling down the stairs. As Hassan was leaving for work a few minutes later, he saw Farah on the floor, struggling to breathe and bleeding. Hassan quickly called the 911 emergency dispatch service.

### VIDEO SURVEILLANCE

Video surveillance was obtained from areas surrounding the Pine Street Apartments and entered into evidence at trial. Around 6:08 p.m. on February 14, 2022, surveillance from a duplex next door shows Anthony walking on the sidewalk while wearing yellow construction boots, blue jeans, and a yellow bandanna hanging out of the rear left pocket of his jeans. About 2½ hours later, the footage shows a man and woman with a light-colored, medium-sized dog. Law enforcement identified the woman as Stephens walking with her dog.

Footage from a building across the street on February 15, 2022, at roughly 5:50 a.m. shows two individuals walking with a light-colored, medium-sized dog on the sidewalk near the Pine Street Apartments. At 5:57 a.m., the surveillance shows the shadows of what appear to be two individuals exiting the west entrance of the building. As they exited the building, the surveillance shows a silhouette or shadow that appeared in a window above the entrance. Officers determined this to be another resident of the Pine Street Apartments who entered the hallway around the same time the two individuals left the building.

At approximately 6:07 a.m., footage shows law enforcement arriving on the scene. At roughly 6:02 a.m., footage from a nearby grocery store shows two individuals, whom law enforcement believed to be Anthony and Stephens, walking with a dog across the street, away from the Pine Street Apartments and toward the Blackstone Apartments. Other evidence established that Anthony's mother lived at the Blackstone Apartments.

### INVESTIGATION INTO ANTHONY
### AND STEPHENS

After their initial investigation, law enforcement focused on locating Anthony and Stephens. Officer Michael Nelson spoke with Mary Hinds, Stephens' mother, 2 days after Farah's death. Nelson testified that Hinds told him Anthony and

Stephens were at Hinds' house in St. Paul, Nebraska. Defense counsel objected to this testimony for hearsay reasons, but the district court overruled the motion on the grounds that the purpose of the testimony was to show its effect on Nelson, the listener.

Based on this information, law enforcement traveled to St. Paul to execute a search warrant on Hinds' residence. Shortly after law enforcement arrived, Stephens and another woman exited the residence. Investigator Nicholas Bonney testified that these women told law enforcement that Anthony was in an attic crawl space in the residence. Anthony's attorney objected to this testimony for hearsay reasons, but the district court overruled the objection, finding that the purpose of the statement was to show its effect on the listener. Bonney testified, without objection, that law enforcement entered the residence, located Anthony in the attic crawl space, and placed him under arrest. Law enforcement found a yellow bandanna while searching the residence.

## STEPHENS' TESTIMONY

Stephens shared her version of the events at trial. In February 2022, Stephens was pregnant and dating Anthony. She testified that she had a dog at that time and that she took her dog everywhere she went. Stephens lived at Hinds' house in St. Paul.

On February 14, 2022, Hinds drove Stephens, Stephens' dog, and Anthony to Anthony's mother's apartment in Grand Island. Anthony and Stephens went to the Pine Street Apartments, specifically Biliew's apartment, several times that day.

The second time visiting Biliew's apartment, Farah opened the back door to the building for them. According to Stephens, as she came through the door, Farah commented to Anthony that he was a "lucky guy" because of his relationship with Stephens. In response, Anthony told Farah to "look away."

On cross-examination, Stephens described, without objection, that Farah's behavior was "weird" in the hours leading up to his death. She elaborated that he was hiding behind doors, walking back and forth, and looking through a small hole in

Biliew's door, which door was located at the top of the stairs in the Pine Street Apartments building.

Defense counsel asked Stephens whether, based on Farah's behavior, she thought he was under the influence. Before Stephens could answer, the district court sustained an objection by the State based on lack of foundation, speculation, and improper opinion. Stephens affirmed that she had seen people under the influence before, "[m]ore than once," responding, "Most definitely." But the State again objected when defense counsel asked Stephens whether, based on this experience, she concluded that Farah was under the influence. Following an off-the-record discussion held at the bench, the court sustained the State's objection to the question based on foundation and improper opinion. Anthony's attorney made an offer of proof that Stephens would have said she believed Farah was under the influence of alcohol around the time of his death.

Stephens testified that as they were knocking on Biliew's apartment door, Anthony told Farah to "show his arm," because Farah had one of his arms covered. Anthony started taking off his sweater and his backpack and saying he was "about that life."

Stephens testified that Farah then attempted to punch Anthony and that Anthony responded by punching Farah in the face and chest area several times. Farah fell over toward the bottom of the stairs, and Anthony "kept going" by kicking Farah in the head.

After Anthony kicked Farah in the head, Farah was "knocked out" and had stopped moving. Stephens was standing at the top of the stairs by Biliew's apartment door. Her dog was barking and pulling on the leash, and she was yelling at Anthony to stop and to leave Farah alone. Stephens then testified that Anthony "was standing there with a knife to [Farah's] eye area and telling [Farah] that he was lucky that his baby girl had stopped him because on his crown, he is about that life." During this time, Stephens described that she was "freaking out" at Anthony.

Stephens testified that she never saw the knife move from Farah's eye area. Anthony eventually stood up. Stephens wanted to ensure "[Farah] was okay," but Anthony ushered her out of the building through the front door and away from where Farah lay.

Stephens described that she and Anthony moved toward the back of the building and through an alleyway and that they then began walking toward the Blackstone Apartments. Stephens explained that she and her dog were walking ahead of Anthony while Anthony followed behind them, directed her where to go, and repeatedly told her to "keep going." Stephens stated that they did not take a direct route to the Blackstone Apartments and that it took an additional 10 minutes to arrive there.

Stephens testified that when they arrived at the Blackstone Apartments, Anthony told an individual named "Puma" that a fight had broken out at the Pine Street Apartments where their mutual acquaintance, Biliew, lived. Puma quickly left and, shortly thereafter, sent a video to Anthony saying that somebody had been stabbed at the Pine Street Apartments. Anthony's counsel objected, based on hearsay and "foundation as to hearsay," to the testimony about what Puma said in the video. The district court overruled the objection.

Stephens testified that after receiving the video from Puma, she and Anthony walked to the home of Anthony's friend, Martiniano Alcorta. Anthony changed his clothes, and after some time, Anthony's mother picked them up to drive them to Hinds' house in St. Paul. Anthony left the clothes he changed out of and his backpack at Alcorta's house.

At some point after the couple arrived at Hinds' house, the police arrived and surrounded it. Stephens testified that while she complied with law enforcement's request to exit the house, Anthony stayed in the house in the attic crawl space. Later, after Anthony was apprehended, Stephens assisted law enforcement in locating Anthony's personal items and a knife that was "exactly like the one that [Anthony] had."

Interviews With Anthony

Law enforcement interviewed Anthony twice during their investigation.

The first interview was the day after his arrest. The content of this interview was introduced into evidence at trial through the testimony of Investigator Ryan Sullivan, one of the officers who conducted Anthony's first interview. Defense counsel did not object to Sullivan's testimony of what Anthony said during the interview.

Anthony indicated that he went to the Pine Street Apartments on two occasions around the time of Farah's death. The second time, he was accompanied by Stephens and her dog. Anthony stated they entered through the east side of the apartment building after a man they did not know, presumably Farah, opened the door for them. Anthony told law enforcement that Farah followed them up the stairs and stood near the other door of Biliew's apartment.

Anthony initially told law enforcement that Farah did not say anything and that he and Stephens left after hearing a "ruckus" inside Biliew's apartment. However, later in the interview, Anthony became emotional and said Farah threatened him and asked him if he was "afraid to die" or "wanted to die."

Anthony told law enforcement that when Farah approached him, Anthony punched him, and that Farah fell down the stairs and hit his head on the doorframe, knocking Farah unconscious. Anthony stated he went down to check Farah's jacket for a gun, but he did not find any weapons and he moved Farah, still unconscious, further onto the staircase landing. When asked whether he was angry with Farah, Anthony responded, "[H]ell, yeah," and then he became frustrated and started to cry.

Though in reality, the murder weapon was never located, officers asked Anthony what he would think if they "discovered a . . . small black, folding knife with a short blade in the area where he fled." Anthony responded that the knife

belonged to his acquaintance who lived in the Blackstone Apartments and that the knife "was stolen," although he did not specify by whom or when. When asked whether Anthony's DNA would be found on the knife, Anthony indicated it would because he had held that knife at one point.

When asked why the knife would be in the area between the Pine Street Apartments and the Blackstone Apartments, Anthony seemed to abandon the story that it had been stolen. Instead, he said he took the knife off Farah. Then, Anthony said the knife came from his own pocket. Later, Anthony said the knife did not come from his own pocket. In any event, Anthony acknowledged he possessed the knife and had thrown it as he was leaving the building because "there was a lot going on."

Anthony also acknowledged that he might have killed Farah after he punched Farah and caused him to fall and hit his head on the doorframe. Anthony admitted that he had a bad habit of kicking people when they fall to the ground, so he had probably kicked Farah after he had fallen down the stairs. He also admitted to kicking Farah in the stomach area and then kicking or stomping on his face two or three times after he had fallen.

After officers told Anthony that they had interviewed Stephens, Anthony admitted he had placed the blade of a knife to the right of Farah's eyebrow, and Anthony's other statements indicated this was while Farah was unconscious. Anthony described what is called "a buck fifty," which is a slang term for leaving a permanent scar on an individual. Anthony confessed he "was going to open his shit up right there." Anthony said he wanted Farah to "remember every day threatening him and his lady." Anthony initially told the officers he decided against it and walked away. Officers then explored with Anthony whether the knife could have accidentally slipped. Anthony initially said he did not think it was possible, but later stated that the knife could have slipped when he turned to look at Stephens or that Farah may have

moved into the blade. When asked what crime he would charge himself with, Anthony stated he would charge himself with manslaughter, "because he didn't mean to kill [Farah]."

During the interview, Anthony indicated that as a child, he was initiated into the Bloods street gang and eventually joined the Latin Kings gang. He said he spends time with the East Side Locos, a "local Surenos-based gang." Officers discussed with Anthony how yellow bandannas are associated with the Latin Kings. Anthony mentioned that, as a member of Latin Kings, he carries a yellow bandanna.

Sullivan testified, without objection, on cross-examination that he told Anthony in the first interview that he "didn't think [Anthony] was a killer." He also told Anthony he could see "remorse in his eyes."

Defense counsel then asked Sullivan whether he told Anthony that it would be "beneficial to him in the criminal case" and that it would "be better in front of a jury or a judge" if he were remorseful. The district court sustained objections by the State based on relevance and hearsay, and Sullivan did not answer the question.

Sullivan testified on cross-examination that Anthony never admitted to intentionally cutting Farah and that Anthony said several times he was trying to protect himself and Stephens. Defense counsel then asked: "I think you said that you agreed with him or you believed him?" The State objected to the form of the question because it called for speculation. The district court sustained the objection on hearsay grounds.

The second interview occurred at Anthony's request on March 4, 2022. The content of this interview was introduced into evidence at trial through the testimony of Investigator Bryce Collamore. Collamore testified that in Anthony's second interview, Anthony told law enforcement that he thought an individual named "Chimmy" had killed Farah after he and Stephens left the apartment building. Anthony explained that his altercation with Farah occurred at 3 or 4 a.m. on February 15 and that the 911 call was made roughly 2 hours later.

When law enforcement informed Anthony of video surveillance showing only a 6-minute difference from when he and Stephens left the Pine Street Apartments to when the 911 call was made, Anthony acted surprised and eventually agreed with law enforcement's timeline. He also admitted during the interview that he "knew that Chimmy did not do it."

Anthony then repeated his original description of how Anthony punched Farah, who fell down the stairs and was knocked unconscious. Anthony stated that he moved the unconscious Farah and that while Farah was lying face down on the floor, Anthony placed the blade of the knife to Farah's right eyebrow. But Anthony changed his recollection of how Farah was cut. Anthony said that after he put the knife up to Farah's eyebrow, Stephens "stopped him" and placed her hand over Anthony's and "grabbed his hand along with the knife." After Stephens pulled the knife down to Farah's neck region, Anthony stated he knew he cut at least two layers of Farah's clothing.

### Autopsy and Cause of Death

Dr. Michelle Elieff, a general and forensic pathologist, testified at trial regarding the autopsy she performed on Farah's body shortly after his death. Dr. Elieff observed a 2½-inch cut on the left side of the Farah's neck. About 80 percent of Farah's jugular vein had been cut. She noted a sharp-edged instrument or knife would have caused the injury due to the lack of scuffing or scratches around the skin or soft tissue. She explained that without medical intervention, this type of injury can cause a person to bleed to death.

Dr. Elieff observed that there was more air in Farah's heart cavity than normal and that the right side of his heart had "swelled outward," which can be associated with a neck injury. She testified that the jugular vein "feeds" the head and pumps blood from the head and neck back into the heart. She stated that the presence of air in the vascular system can cause an abnormal heart rhythm and that a large amount of air going to the heart can cause sudden death. According to Dr. Elieff,

the underlying cause of death was an intracardiac air embolism that resulted from the cutting injury on Farah's neck, which caused air to enter the vascular system and accumulate in the heart. She estimated Farah died within a matter of seconds to minutes after sustaining the cut.

Dr. Elieff observed several abrasions near the top of Farah's head that occurred around the time of his death. Near his right cheek, Farah also had a bruise accompanied by an abrasion. One injury in particular "had a semi-circular component to it" and curved with a bruise and an abrasion on Farah's right upper cheek. According to Dr. Elieff, these injuries did not contribute to Farah's death.

Dr. Elieff noted that a toxicology report revealed amphetamine and methamphetamine in Farah's body. She explained that although these substances may have affected Farah's behavior prior to his death, they did not contribute to his death.

### Theory of Defense

Defense counsel described in opening statements how Farah had let Anthony and Stephens into the Pine Street Apartments and was acting "weird." Defense counsel told the jury, without objection, that Farah's behavior led Anthony and Stephens to believe Farah was under the influence.

In both opening statements and at closing arguments, defense counsel conceded there was an altercation between Anthony and Farah. This began when Farah said things about Stephens. Defense counsel argued in closing that Farah "threw the first punch."

Defense counsel described that the fight between Anthony and Farah "end[ed] with . . . Farah lying on the floor in the corridor of the apartment building unconscious." Defense counsel described how, thereafter, Anthony held a knife to Farah's eyebrow. Defense counsel argued that Stephens then intervened and stopped Anthony from stabbing Farah. Defense counsel argued that Anthony and Stephens left Farah unconscious on the corridor floor without doing him any further harm.

The theory of the defense was that someone else killed Farah after Anthony and Stephens left. At closing arguments, defense counsel pointed out that Anthony and Stephens left the Pine Street Apartments at 5:57 a.m., on February 15, 2022, according to surveillance video. But because Hassan found Farah still breathing when he opened the door for law enforcement after calling 911 at 6:03 a.m.—and Dr. Elieff testified it would have taken a matter of seconds to minutes for Farah to die of his injuries—"[i]t doesn't match up." Defense counsel reminded the jury that, in the surveillance video, a shadow appeared in the window above the entrance about the same time Anthony and Stephens left and reappeared 60 seconds later. According to defense counsel, whoever that person was, that person did not call the police and was the person who killed Farah.

## Convictions and Sentences

The State rested, and after electing not to present any evidence, Anthony moved for a directed verdict. The district court overruled the motion.

With respect to Farah's death, the jury was instructed that it could find Anthony either guilty of first degree murder, guilty of second degree murder, guilty of manslaughter, or not guilty. The jury found Anthony guilty of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon.

At sentencing, the district court found the State had failed to meet its burden that Anthony was a habitual criminal. It sentenced Anthony to life in prison for first degree murder, 30 to 50 years' imprisonment for use of a deadly weapon, and 3 to 4 years' imprisonment for possession.

Anthony appeals his convictions.

## ASSIGNMENTS OF ERROR

Anthony assigns, restated, that the district court erred by (1) allowing into evidence statements made to law enforcement regarding Anthony's location in St. Paul and his location

in the crawl space of the St. Paul residence, (2) allowing Stephens to testify as to the contents of a video sent by Puma to Anthony, (3) preventing Stephens from testifying about whether Farah was under the influence of drugs during the hours leading up to his death, and (4) excluding testimony of law enforcement regarding statements made to Anthony in his postarrest interview about his remorse and whether law enforcement believed Anthony's version of the facts.

## STANDARD OF REVIEW

[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1]

[2] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[2]

[3] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[3]

[4] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[4]

[5] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[5]

---

[1] *State v. Lorello*, 314 Neb. 385, 991 N.W.2d 11 (2023).

[2] *Id*.

[3] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[4] *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

[5] *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023).

## ANALYSIS

Anthony's assignments of error all relate to evidentiary rulings made by the district court at trial. Anthony argues on appeal that the district court erred by preventing Stephens from expressing her lay opinion that Farah was under the influence of drugs during the altercation with Anthony. Anthony argues the court erred in overruling his hearsay objections to statements made to law enforcement that Anthony was at Hinds' house and, more specifically, hiding in the crawl space. He also argues the court erred in overruling his hearsay objection to Puma's statement that someone had been stabbed at the Pine Street Apartments. Finally, Anthony argues the district court erred in excluding law enforcement's statements to Anthony in his postarrest interviews about remorse being beneficial and whether law enforcement believed Anthony's version of the facts.

### Excluding Stephens' Opinion That Farah Was Under Influence

We first address Anthony's argument that the district court erred by not allowing Stephens to testify about whether she believed Farah was under the influence at the time of the altercation. Anthony argues that lay witnesses with firsthand knowledge are competent under Nebraska law to testify on this topic. Thus, he claims the court should have overruled the State's objections based on speculation, improper opinion, and foundation, and allowed Stephens to provide this testimony.

Neb. Rev. Stat. § 27-701 (Reissue 2016), provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

[6-8] It is well established in Nebraska that a lay witness may give an opinion as to intoxication, at least where it has been established that the witness had an opportunity to

observe the person.[6] To be "under the influence" entails loss to an appreciable degree of the normal control of one's bodily and mental faculties and to the extent that there is an impairment of the capacity to think and act correctly and efficiently.[7] A lay witness can render an opinion regarding intoxication provided the witness first details the facts upon which the opinion is based.[8]

[9-13] A witness is not permitted to render an opinion based on obvious speculation or conjecture.[9] To the extent reasonably feasible, the witness ought to attempt to convey the concrete primary facts to the trier of fact.[10] Generally, the lay witness' opinion must be based on the witness' perception, foundation must establish a rational basis for the opinion, and the testimony must be helpful to the trier of fact.[11] These principles apply to alcohol, as well as to drug intoxication.[12] However, it has been said that adequate foundation of a witness' personal knowledge is especially important with respect to drug intoxication, because the average person may have little or no experience with drugs, and it thus falls outside the realm of common experience.[13] The amount of a witness' prior experience that is sufficient for an adequate foundation should be left to the discretion of the trial judge.[14]

---

[6] *Hansen v. Hasenkamp*, 192 Neb. 530, 223 N.W.2d 44 (1974).

[7] See *id*. See, also, e.g., *State v. Johnson*, 215 Neb. 391, 338 N.W.2d 769 (1983); *McCulley v. Anderson*, 119 Neb. 105, 227 N.W. 321 (1929).

[8] See *State v. Johnson, supra* note 7. See, also, *State ex rel. City of St. Paul v. Rutten*, 177 Neb. 633, 130 N.W.2d 558 (1964).

[9] *State v. Johnson, supra* note 7.

[10] See 1 McCormick on Evidence § 11 (Robert M. Mosteller ed., 8th ed. 2020).

[11] See 11 Minnesota Practice Series, Evidence § 701.02 (5th ed. 2023).

[12] See 3 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 12:8 (15th ed. 1999).

[13] See *U.S. v. Baraloto*, 535 Fed. Appx. 263 (4th Cir. 2013) (Gregory, J., dissenting).

[14] See *Harris v. District of Columbia*, 601 A.2d 21 (D.C. 1991).

An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[15] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[16] On the record presented, the court's ruling was not clearly untenable.

Although Stephens had never met Farah before the morning of his death, she witnessed Farah's behavior firsthand before his altercation with Anthony. Though we agree with the State that "weird" is not a concrete primary fact,[17] Stephens elaborated that Farah was hiding behind doors, walking back and forth, and looking through a small hole in Biliew's door, which door was located at the top of the stairs in the Pine Street Apartments building.

However, the only foundation to establish a rational basis for Stephens' opinion that such behaviors exhibited drug intoxication was Stephens' vague affirmation that she had seen people intoxicated before "[m]ore than once." There was little to show that Stephens' lay opinion was not mere speculation, especially when the behavior described by Stephens is consistent with nervousness from a multitude of causes that would not involve intoxication. It was not unreasonable for the court to find inadequate foundation where the extent of Stephens' experience was unclear and there was no concrete description of the types of behaviors that Stephens, in her past experience, had seen exhibited by persons she knew to be under the influence of drugs.

[14,15] Even if we assume the district court should have allowed Stephens to provide her lay opinion that Farah was under the influence, the error was harmless. Harmless error

---

[15] *State v. Henderson, supra* note 3.

[16] *State v. Greer, supra* note 4.

[17] See *People v. Cruz*, 175 A.D.3d 1060, 108 N.Y.S.3d 620 (2019).

jurisprudence recognizes that not all trial errors entitle a criminal defendant to the reversal of an adverse trial result.[18] An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt.[19]

[16-18] The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[20] Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[21] Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.[22]

Stephens' excluded testimony that Farah was under the influence would have been largely cumulative to other evidence received at trial without objection. Dr. Elieff testified that Farah had amphetamine and methamphetamine in his system at the time of his death and that these substances may have affected Farah's behavior. Chandler testified at trial that Farah "was acting different, kind of off, like strange" the evening before Farah's altercation with Anthony. Biliew testified that he woke up and observed Farah sitting by himself on the interior stairs of the apartment building and that he let Farah in, but Farah left shortly thereafter. Stephens testified that Farah was acting "weird" by hiding behind doors, walking back and forth, and looking through a small hole in Biliew's door, which door was located at the top of the stairs

---

[18] See *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018).

[19] *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017); *State v. Matthews*, 289 Neb. 184, 854 N.W.2d 576 (2014).

[20] *Id.*

[21] *Id.*; *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[22] *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996).

in the Pine Street Apartments building. Finally, although not evidence, the jury was told in opening statements that Farah's strange behavior led Anthony and Stephens to conclude that he was under the influence.

The testimony adduced at trial did not clearly connect witnesses' observations of Farah's behavior to an opinion that he was under the influence at the time of his death, but it was clearly an inference the defense was asking to be drawn. Furthermore, it was the behavior, rather than the drug consumption per se, which was relevant to Anthony's defense. Anthony adduced evidence of Farah's erratic and strange behavior because it was consistent with Anthony's contention that Farah was the first aggressor.

But whether Farah was under the influence and was the first aggressor were of minimal legal significance when the evidence was overwhelming, even undisputed, that Farah was stabbed while he was unconscious. Anthony admitted in post-arrest interviews that he engaged in a physical altercation with Farah that led to Farah's being unconscious when Anthony held a knife to Farah's face. The basic events of the altercation leading to Farah's being unconscious before he was stabbed were supported by video surveillance footage and the testimony of several witnesses.

[19] An unconscious adversary does not pose an imminent threat of death or serious bodily harm for purposes of a claim of self-defense that could render a defendant not guilty.[23] And the defense did not argue that Anthony killed Farah while still in the heat of passion or without premeditation. The defense argued Anthony did not kill Farah at all. Defense counsel argued to the jury that Anthony left Farah unconscious and that someone else killed Farah after Anthony and Stephens left. Under this theory, it was irrelevant whether Farah was

---

[23] See, also, e.g., *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989); *Kulhanek v. State*, 560 S.W.3d 94 (Mo. App. 2018); *Thomas v. State*, 918 So. 2d 327 (Fla. App. 2005).

under the influence. The court's exclusion of Stephens' lay opinion that Farah was under the influence had little to no import relative to the rest of the untainted, relevant evidence pertaining to what was at issue at trial. The actual guilty verdict rendered was surely unattributable to any error in excluding Stephens' lay opinion that Farah was under the influence.

### Hearsay

We next address Anthony's arguments that the court erred in admitting three statements he asserts were inadmissible hearsay. These are Hinds' statement to Nelson that Anthony and Stephens were at her house in St. Paul, statements that Anthony was hiding in the crawl space at Hinds' house, and Puma's statement that someone had been stabbed at the Pine Street Apartments. We agree with the State that these statements were properly admitted for relevant nonhearsay purposes related to their effect on the listener.

Neb. Rev. Stat. § 27-802 (Reissue 2016) provides that "[h]earsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court." Neb. Rev. Stat. § 27-803 (Cum. Supp. 2022) sets forth several exceptions offered for the truth of the matter asserted, which are not excluded by the hearsay rule. Anthony is correct that none of those statutory exceptions are applicable to the subject statements.

[20,21] However, by definition, an out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.[24] Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2022) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*.[25] Whether a particular statement is

---

[24] *State v. Vaughn, supra* note 5.

[25] See, also, *id*.

hearsay "will most often hinge on the purpose for which it is offered."[26]

[22,23] Accordingly, statements are not hearsay to the extent they are offered for context and coherence of other admissible statements[27] or to explain the course of a series of events.[28] Similarly, statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.[29]

[24] Statements made to law enforcement to explain the steps taken in an investigation of a defendant, rather than to prove the truth of the matter asserted, are generally admissible as nonhearsay so long as the probative value of the evidence's nonhearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by an impermissible hearsay use of the statements.[30] For example, in *State v. Vaughn*,[31] we determined that an out-of-court statement specifying the defendant's location on a passenger train was admissible to explain law enforcement's actions in searching for the defendant and did not fall within the definition of hearsay. In *Vaughn*, during a scheduled stop, law enforcement searched the train and found an unmarked duffelbag with several packages of marijuana inside. A train employee told officers the bag belonged to the man in room No. 12. Law enforcement

[26] *U.S. v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998).

[27] *State v. Vaughn, supra* note 5.

[28] See *State v. Parker*, 276 Neb. 661, 757 N.W.2d 7 (2008) (Gerrard, J., concurring) (and cases cited therein).

[29] *State v. Vaughn, supra* note 5.

[30] See, *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023); *State v. Vaughn, supra* note 5. See, also, *U.S. v. Ibarra-Diaz*, 805 F.3d 908 (10th Cir. 2015); *U.S. v. Taylor*, 569 F.3d 742 (7th Cir. 2009); *U.S. v. Jiminez*, 564 F.3d 1280 (11th Cir. 2009); *U.S. v. Brown*, 923 F.2d 109 (8th Cir. 1991); *United States v. Levy*, 904 F.2d 1026 (6th Cir. 1990); *United States v. Love*, 767 F.2d 1052 (4th Cir. 1985).

[31] *State v. Vaughn, supra* note 5.

located the defendant in room No. 12 and discovered additional bags of marijuana. In an appeal from the defendant's convictions, we held the district court properly admitted the train employee's statement because it "bridged" the officer's statements at trial that he saw the unmarked duffelbag that contained marijuana and later knocked on the door of room No. 12 and asked the defendant whether he owned the duffelbag.[32] Put differently, the train employee's statements provided context and "showed why [the officer] went to [room No.] 12 to ask questions about the duffelbag and encountered [the defendant]."[33]

Hinds' statements to Nelson that Anthony and Stephens were at Hinds' house in St. Paul similarly bridged the testimony that Nelson spoke to Hinds and that law enforcement went to Hinds' house in St. Paul, providing context as to why Nelson traveled to the residence in St. Paul. Likewise, the statements to Bonney that Anthony was in the crawl space explain why law enforcement entered the residence and searched for Anthony in the attic.

[25] Statements admitted for the purpose of showing the defendant's response and state of mind are generally admissible as nonhearsay if relevant to the case and not unfairly prejudicial. Thus, in *People v. Weatherspoon*,[34] the defendant's statements that 3 days after the victim's body was discovered and he fled the state, he was threatened by the victim's brother and friends, were admissible for the nonhearsay purpose of proving the defendant did not flee because of a consciousness of guilt but instead because he was threatened. Puma's statement that somebody had been stabbed was relevant to determining Anthony's state of mind when he went to a friend's house, changed his clothes, and left his belongings

---

[32] *Id.* at 189, 989 N.W.2d at 396.

[33] *Id.*

[34] *People v. Weatherspoon*, 394 Ill. App. 3d 839, 915 N.E.2d 761, 333 Ill. Dec. 690 (2009).

there before fleeing to St. Paul. It was relevant to whether he took those measures out of a consciousness of guilt.

Neither the statements to law enforcement regarding Anthony's location, nor Puma's statement that someone had been stabbed, were unfairly prejudicial. Indeed, Anthony makes no argument as to how he was prejudiced by their admission. The statements were entirely cumulative of other evidence admitted at trial. Bonney ultimately testified, based on his first-hand knowledge from entering the home and conducting the search, that law enforcement located Anthony hiding in the crawl space at Hinds' house in St. Paul. There was abundant evidence admitted, without objection, demonstrating Farah had been stabbed, which was not a matter disputed by either party.

The district court did not err in finding the statements about Anthony's location and that Farah had been stabbed were admitted for the nonhearsay purposes of context and coherence of other admissible statements and to explain the course of a series of events and the listeners' state of mind after hearing the statements. The district court did not err in implicitly finding these were facts relevant to issues in the case and that, because of their cumulative nature, the probative value of the statements' nonhearsay purposes was not substantially outweighed by the danger of unfair prejudice from possible impermissible hearsay uses. For the same reason, even if the court's rulings were, hypothetically, in error, they were harmless.

### Statements Made by Law Enforcement During Anthony's Postarrest Interviews

Lastly, we address Anthony's argument that the district court erred by not allowing Sullivan to testify about whether he told Anthony that he believed Anthony's statements and that it would be beneficial to Anthony in a criminal case if he were remorseful.

[26-28] The State points out that Anthony failed to make an offer of proof as to what Sullivan would have answered

had he been allowed to ask whether he told Anthony that he believed Anthony's statements and that it would be beneficial to Anthony in a criminal case if he were remorseful. Pursuant to Neb. Rev. Stat. § 27-103(1)(b) (Reissue 2016), error may not be predicated upon a ruling that excludes evidence, unless a substantial right of the party is affected and the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.[35] Thus, in order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited, and that offer of proof must be made at trial.[36] In the absence of an offer of proof, however, an appellate court may still entertain a challenge to the exclusion of evidence on appeal if the substance of the evidence was apparent from the context within which the question was asked and the evidence would have been material and competent.[37] An offer of proof is frequently unnecessary "where a particular answer to a leading question permits, and examining counsel obviously expects, an answer favorable to his client," or "where the cross-examiner expects an unfavorable response and obviously intends to pursue a given line of inquiry."[38]

In *State v. Rodriguez*,[39] for example, we determined an offer of proof was not required for appellate review because it was clear from the context of the questioning the defendant was attempting to impeach a witness. In *Rodriguez*, a jury convicted the defendant of five counts of first degree murder for his involvement in a deadly bank robbery. During trial,

---

[35] *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

[36] See *id*.

[37] See *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998).

[38] 1 Michael H. Graham, Winning Evidence Arguments: Advanced Evidence for the Trial Attorney § 103:7 at 47 (2006).

[39] *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007).

the defendant's attorney sought to impeach a witness with a prior inconsistent statement, but the trial court sustained an objection raised by the State. Defense counsel failed to make an offer of proof. We elected to review the error on appeal because it was "apparent from the record that [the defense counsel] was attempting to impeach [the witness]."[40] In other words, we concluded that an offer of proof was not required because the substance of the evidence was apparent from the context in which the questions were asked.[41]

In contrast, in an appeal from a conviction for second degree murder and use of a weapon, the Nebraska Court of Appeals in *State v. Heng*[42] held it was unable to address the merits of the exclusion of a 911 recording because the defendant failed to give an offer of proof at a trial. A resident, who called 911, claimed to have witnessed the shooting. During cross-examination of the resident, the defense wished to introduce into evidence the entirety of the 911 recording. The trial court sustained the State's objection after the recording was played for the trial judge outside the presence of the jury. The Court of Appeals explained, "Without knowing the specific contents of the complete recording, including the exact language used by [the resident] or the tone of his voice, we simply cannot say whether the district court erred in sustaining the State's objection."[43] The Court of Appeals also did not discuss whether the proffer of the 911 recording was in response to any particular testimony, and it pointed to several times the 911 call was utilized to effectively impeach the witness.

---

[40] *Id*. at 947, 726 N.W.2d at 173.

[41] See, also, *Sherman County Bank v. Kallhoff*, 205 Neb. 392, 288 N.W.2d 24 (1980). But see, *Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 572 N.W.2d 790 (1998); *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., supra* note 37.

[42] *State v. Heng*, 25 Neb. App. 317, 905 N.W.2d 279 (2017).

[43] *Id*. at 337, 905 N.W.2d at 295.

Like the facts presented in *Rodriguez*, it is apparent from the context of the questions that Anthony sought to elicit testimony from Sullivan that he told Anthony he believed Anthony's interview statements and that it would be beneficial to Anthony in a criminal case if he were remorseful. Unlike in *Heng*, we do not need to know the specific contents of the complete interview to understand what defense counsel was trying to adduce. Knowing that defense counsel sought to elicit testimony that Sullivan told Anthony he believed him and that it would be beneficial in front of a jury or a judge to express remorse, we hold the court did not err in excluding those statements.

First, the court did not err in excluding, as inadmissible hearsay, Sullivan's out-of-court statement that he believed Anthony when he said he did not intend to hurt Farah and was trying to protect himself and Stephens. We find no merit to Anthony's argument that we cannot affirm the court's ruling, even if correct, because the State did not object on hearsay grounds.

[29] The State objected on the ground of speculation, and Anthony alludes to our opinions stating that an objection on a specific ground that was properly overruled does not preserve a question of appellate review on any other ground.[44] Thus, we have said that a failure to object at trial to the admission of evidence on the specific grounds of hearsay bars the appellant from asserting hearsay as a ground for error by the trial court in refusing to exclude the testimony.[45]

[30-32] However, it does not follow that a trial court errs by excluding evidence on a legally correct ground different from the ground raised in a party's objection to the evidence. We have often said that an appellate court may affirm a lower court's ruling that reaches the correct result—even

---

[44] See *Havlicek v. State*, 101 Neb. 782, 165 N.W. 251 (1917). See, also, *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003); *Baucom v. Drivers Mgmt., Inc.*, 12 Neb. App. 790, 686 N.W.2d 98 (2004).

[45] See *Carpenter v. Cullan*, 254 Neb. 925, 581 N.W.2d 72 (1998).

if the reasoning on appeal is different than the trial court's reasoning.[46] Akin to this rule, it has elsewhere been said that a judge is not limited to sustaining an objection to a witness' testimony solely on the ground raised by a party's objection.[47] If a judge concludes that an objection is properly sustained on a different ground, the judge may do so.[48] We agree. Where the court's ruling sustaining an objection to the proffered evidence was legally correct, we will not find reversible error simply because the basis for its ruling was different than that asserted by the objecting party.

[33,34] It reasonably appeared that defense counsel wished to adduce Sullivan's statement that he believed Anthony for the truth of the matter asserted, i.e., that Anthony lacked the necessary intent to be guilty of first degree murder. We find no merit to Anthony's contention, made for the first time on appeal, that Sullivan's statement that he believed Anthony was relevant for the nonhearsay purpose of demonstrating that Anthony's confession was not voluntary. We disagree with Anthony's argument that the statement by Sullivan that he believed what Anthony had already said was an "inducement or promise, however slight, entering into the totality of circumstances" of the "voluntariness matrix."[49] The test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined.[50] An officer's telling a defendant that the officer believes what the defendant has already told the officer is not probative of whether

---

[46] See, e.g., *Schaeffer v. Frakes*, 313 Neb. 337, 984 N.W.2d 290 (2023).

[47] See California Judges Benchbook: Civil Proceedings Before Trial § 5.33 (2022) (restricting method of examination).

[48] See, *id.*; *People v. Robinson*, 47 Cal. App. 5th 1027, 261 Cal. Rptr. 3d 371 (2020).

[49] Brief for appellant at 19.

[50] *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991).

law enforcement had overborn the defendant's will to resist making the statement.

For similar reasons, we find no error in the court's sustaining, on relevancy and hearsay grounds, the State's objection to Anthony's adducing Sullivan's out-of-court statement to the effect that if Anthony showed remorse "in front of a jury or a judge," it could help his court case. The only relevancy of this statement argued by Anthony on appeal pertains to the voluntariness of his interview statements, and the statement is not relevant to voluntariness. His statements in the interview were not in front of a jury or a judge. This generic advice given by the officer to Anthony during the interview was not sufficient to override Anthony's will to resist making inculpatory statements.

## CONCLUSION

For the foregoing reasons, we affirm the judgment below.

Affirmed.