Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/20/2026 08:08 AM CDT

State of Nebraska, appellee, v.
Quan A. White, appellant.

___ N.W.3d ___

Filed March 20, 2026.    No. S-24-722.

1.  **Trial: Joinder: Proof: Appeal and Error.** A denial of a motion to sever will be reversed only if an abuse of discretion is shown that caused the defendant substantial prejudice amounting to a miscarriage of justice.
2.  **Trial: Evidence: Appeal and Error.** An appellate court's review concerning the admissibility of physical evidence, including foundation and chain of custody issues, is for an abuse of discretion.
3.  ____: ____: ____. An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.
4.  **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.
5.  **Criminal Law: Joinder: Presumptions.** A clear presumption exists in favor of a joinder of offenses and against severance.
6.  **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.
7.  **Trial: Joinder.** Whether offenses are sufficiently connected together or part of a common scheme or plan involves consideration of the totality of the circumstances weighed in light of broadly construing permissive joinder to promote trial economy and judicial efficiency.
8.  **Criminal Law: Words and Phrases.** To be part of a common scheme or plan, it is not necessary that all the crimes were specifically contemplated before any one of them was committed; it is sufficient if the

related crimes developed as events unfolded and in furtherance of the group's objectives.

9. **Joinder: Proof.** A defendant opposing joinder must meet a high burden of proving prejudice therefrom by showing compelling, specific, and actual prejudice from the court's refusal to grant a motion to sever.

10. **Joinder: Evidence.** Cross-admissibility of evidence pertaining to joined charges is only one consideration in determining prejudice.

11. **Rules of Evidence: Other Acts.** Evidence of other crimes, wrongs, or acts may be admitted under Neb. Rev. Stat. § 27-404(3) (Cum. Supp. 2024) where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.

12. ____: ____. Inextricably intertwined evidence is not subject to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024).

13. **Criminal Law: Evidence: Other Acts.** Evidence that is inextricably intertwined includes evidence that forms part of the factual setting of the crime, is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or is necessary for the prosecution to present a coherent picture of the charged crime.

14. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

15. **Joinder.** The same general principles governing joinder of charges govern joinder of defendants.

16. **Trial: Joinder: Evidence: Jury Instructions.** Even when the risk of prejudice from the admission of evidence in a joint trial is high, less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice.

17. **Rules of Evidence: Proof.** A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of Neb. Rev. Stat. § 27-901(1) (Reissue 2016).

18. **Criminal Law: Evidence.** Important to questions of chain of custody are the nature of the exhibit, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.

19. ____: ____. It is enough that the State establish the reasonable probability that the evidence was not compromised; after that, deficiencies

in the chain of custody go to the weight, not the admissibility, of the evidence.

20. **Evidence: Testimony.** The testimony establishing an evidentiary chain of custody must be sufficiently complete so as to render it improbable that the original item has been exchanged, contaminated, or tampered with.

21. **Witnesses.** The amount of a witness' prior experience that is sufficient for an adequate foundation is left to the discretion of the trial judge.

22. **Trial: Testimony.** Lay testimony should be excluded whenever the point is reached at which the trier of fact is being told that which it is itself entirely equipped to determine.

23. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.

24. **Criminal Law: Jury Instructions.** When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case.

25. **Jury Instructions.** An instruction which does not correctly state the law or which is likely to confuse or mislead the jury should not be given.

Appeal from the District Court for Douglas County: Todd O. Engleman, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Mary Mullin Dvorak, Megan E. Jeffrey, and Samuel A. Raybine for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Freudenberg, J.

## I. INTRODUCTION

The appellant was convicted of 11 counts, including first degree murder. He argues on appeal that the district court erred in denying his motion to sever robbery and theft charges from the other charges involving murder, assault, use of a weapon,

and discharging a firearm and that the court erred by denying his motion to sever his trial from that of his codefendant, who fired the weapon that killed the victim. Further, he asserts the court should have added to the aiding and abetting instruction that mere presence is insufficient to support a guilty verdict. Lastly, he argues the court erred by failing to exclude (1) evidence found in the suspect vehicle after a break in police custody and (2) police testimony identifying him in video surveillance. We affirm.

## II. BACKGROUND

### 1. CHARGES

In relation to a series of gang-related events over the course of several days in June 2021, Quan A. White was charged in the operative third amended information with 11 counts: one count of murder in the first degree; one count of assault in the first degree; two counts of discharging a firearm at an inhabited house, occupied building, or occupied vehicle; one count of theft by receiving $5,000 or more; one count of robbery; and five counts of use of a deadly weapon (firearm) to commit a felony. In the prior information, the robbery count was a theft-by-receiving count and there were only four weapons charges.

The robbery was alleged to have occurred on June 13, 2021. The theft was alleged to have occurred on June 17. All the other crimes were alleged to have occurred on June 16.

The State alleged that White was with Mariano Flores and Nowa Kawunda from June 13 through 17, 2021, and that the three committed all 11 crimes together. At the time of the crimes, White and Flores were both 15 years old and Kawunda was 14 years old. The State alleged that, on June 13, these three stole a four-door white sedan, a Volkswagen Jetta, at gunpoint. Then, on June 16, using the Jetta, the three committed a driveby shooting, killing one victim and wounding another. They immediately proceeded to a second location, where they exited the vehicle and fired upon an occupied

vehicle in the parking lot, leaving its owner and the occupant of a nearby apartment with minor injuries. The three fled in the Jetta and eventually stole the second vehicle, a Toyota Scion, on June 17, when its owner left it unlocked and running at a gas station. All three were apprehended on June 17 after the owner of the Scion tracked it to the defendants' location.

## 2. White and Flores' Joint Trial

The district court granted the State's motion for a joint jury trial of White, Flores, and Kawunda. The court found that the three defendants participated in the same series of acts or transactions constituting the offenses charged. It also found the defendants had failed to show compelling prejudice from the joinder, noting the factual allegations were relatively straightforward and any prejudice could be cured through jury instructions.

Before trial, Kawunda entered into a plea agreement under which he agreed to testify. Thereafter, White's counsel moved for the court, in its discretion, to sever his trial from Flores' trial. Counsel argued White would be prejudiced by, among other things, the admission of evidence from Flores' phone, which White's counsel claimed would not otherwise be admissible. For the same reasons the court granted the State's motion for a joint trial, the court denied White's motion to sever the trial of his case from that of his codefendant Flores.

## 3. Motion to Sever Theft Charges

The court also denied White's counsel's pretrial motion to sever two theft charges from the other nine charges, which motion was filed and argued before one of those theft charges was amended to a robbery charge. White had asserted that the thefts were not part of the same transaction or a common scheme or plan involving the murder, assault, and firearm charges and that the joinder of the theft charges would prejudice him because of the alleged lack of cross-admissibility if the charges were tried separately.

## 4. EVIDENCE AT TRIAL

### (a) Robbery of Jetta

At trial, the evidence showed that law enforcement was called to the scene of a carjacking around 3:30 a.m. on Sunday, June 13, 2021, at a park with a swimming pool in Omaha, Nebraska. The vehicle was a 2013 white Jetta with no license plates.

The victim of the carjacking, Emmanuel Jacinto Franco, testified that, before the carjacking, in the early morning hours of Sunday, June 13, 2021, he was "cruising" with his teenaged friends, Antonio Chavez-Ursino and Andrea Molina, in his recently purchased Jetta. The Jetta still had an in-transit sticker in the back windshield.

They picked up a friend of Molina's, Selena Baker. Then Baker asked if they could pick up her friend, Alexa Villegas. Jacinto Franco thought they were just picking up Villegas; however, when they showed up, she was with three people later identified as White, Flores, and Kawunda. All eight individuals squeezed into the Jetta. Jacinto Franco testified he had a bad feeling he was being set up.

They all decided to go to a local swimming pool, even though it was closed. The group was able to get into the pool area, with different accounts of how that was accomplished. The females swam in the pool while the males "were chilling."

After a while, Kawunda asked Jacinto Franco if he could borrow his phone charger that was in the Jetta. Kawunda walked with Jacinto Franco to the Jetta. Jacinto Franco retrieved the charger and, when he turned around, was confronted with Kawunda pointing a gun at him and demanding, "[G]ive me all your stuff before I blow your head up." When Jacinto Franco refused, Kawunda hit him in the face with the gun. Jacinto Franco complied, giving Kawunda his wallet, two phones, and car keys. Kawunda drove away in the Jetta, stopping briefly to retrieve White and Flores.

### (b) Hanks 2.0 Bar Shooting

Three days later, around 2 a.m. on Wednesday, June 16, 2021, "ShotSpotter," a network of acoustic sensors strategically positioned around Omaha, detected a shooting at the parking lot outside of the "Hanks 2.0" bar (Hanks) near 40th Street and Ames Avenue.

During the shooting, Timothy Washington suffered rifle-type gunshot wounds to his head, trunk, and left shoulder. The wound to Washington's head was almost instantaneously fatal.

Danaija Hunter, who was standing near Washington, was injured from a rifle-type wound to her arm. ShotSpotter identified there were at least eight shots initially fired in rapid succession, followed by a slight pause, and then multiple additional shots indicating return fire.

Hunter and her sister, Dajua Liggens, were at that location for a friend's birthday party. There was a food truck and music playing in the parking lot, which was occupied by approximately 20 to 40 people. Some of those people belonged to the "Crips" gang.

Liggens testified she was waiting in Hunter's vehicle a few feet from Hunter when a red car sped up Ames Avenue, made a U-turn, and drove by the Hanks parking lot while its occupants shot in their direction. People in the group at the parking lot fired back. Liggens said she saw one of Washington's friends take a gun from Washington's hand after he died. Hunter testified she had her back to Ames Avenue and did not see the vehicle.

### (c) Shooting at Spencer East Projects

Seventeen minutes after the shooting at the Hanks parking lot, ShotSpotter picked up another shooting in the Spencer East Projects (Spencer East), a nearby housing complex.

During the shooting, gunfire entered an apartment where Jamiaha McKaufman lived with her boyfriend and three young children. McKaufman testified she was in bed with two of her children when she heard shots and saw what looked

like firecrackers outside the window. As bullets "were flying through [their] bedroom," she jumped out of bed, and her boyfriend flipped the bed over to protect them. McKaufman suffered a graze wound to her forehead.

Another victim, Mack Johnson, was in his vehicle in the parking lot of Spencer East. He heard about 20 shots in total and described that they were coming at him from two different directions. He was able to roll to the floor of the vehicle to protect himself. Johnson suffered a bullet graze across his head and small wounds from broken glass fragments.

According to the testimony of Omaha police Det. Matei Jackson, both the Hanks and Spencer East shootings occurred in "notable Crip neighborhoods."

### (d) Ammunition Casings at the Scenes

Ammunition casings, 9-mm, .40-caliber, and 7.62×39-mm, were found at the scene of the Hanks shootings. Angela Harder, a senior forensic technician and firearm and toolmark examiner, determined from these casings that there were at least four different guns involved in the Hanks shooting.

Law enforcement found .40-caliber casings at the corner in Spencer East where Kawunda was shooting in Johnson's direction. Several 7.62×39-mm casings, consistent with a high-caliber rifle, as well as .45-caliber casings, were found elsewhere at the scene of the Spencer East shooting. Harder determined from the casings that three firearms were used in the Spencer East shooting. She determined the 7.62×39-mm casings found at both the Hanks and Spencer East shootings had distinctive characteristics demonstrating they were from ammunition fired in the same weapon. She could not find any match between the .40-caliber casings at the two shootings.

### (e) Theft of Scion

The day after the shootings, in the early morning hours of Thursday, June 17, 2021, there was an auto theft reported at a gas station near 137th and Q Streets in Omaha. The stolen vehicle was a 2008 purple Toyota Scion. The Scion's owner,

Kyra Parker, was on her way home after a shift as a bartender and had left the Scion running and its doors unlocked while she went into the gas station to buy water and a snack. When she came back out, her Scion was gone. Parker had left her phone and her keys with a tracking device in the Scion.

Parker was able to look at the gas station's video surveillance footage of the incident. It showed someone exit a white vehicle, get in her Scion, and drive it away. Around noon that same day, Parker, her mother, her younger brother, and her younger brother's friend decided to track down her missing Scion using the tracking device and phone location information. They gave law enforcement the location of the Scion and proceeded to the Southside Terrace area, which was where the tracking device indicated the Scion might be found.

Jackson testified that the Southside Terrace is a "notoriously Blood neighborhood" and that the Bloods and Crips are rival gangs. Parker's party found three people driving around the Southside Terrace area in Parker's Scion. They were in contact with the police and continued to follow the Scion until the police arrived.

### (f) Apprehension of White, Flores, and Kawunda

Officer Brian Seaton arrived at the scene and found the three people described had exited the Scion and were standing with several juveniles a short distance away. When Seaton approached, the juveniles started walking away. Seaton and his partner split up, as did the rest of the group. Three members of the group went one direction, and the rest went another.

A police helicopter unit had been monitoring the situation, and Seaton obtained from Parker's group a description of the people she saw in her Scion. The main person she described, whom she also recognized from the surveillance video at the gas station, was Kawunda. The helicopter unit kept a lookout for the party matching Kawunda's description and advised that he and two other suspects had "take[n ]off running."

The helicopter unit next advised that the three had entered a white sedan and were driving out of the Southside Terrace parking lot. Seaton stopped in the middle of the street. The white sedan clipped the front end of Seaton's cruiser and continued fleeing. As the white sedan traveled over a nearby bridge, it struck another vehicle. White, Flores, and Kawunda exited the sedan and began running again. With law enforcement boxing them in at both ends of the bridge, they were finally apprehended.

When White, Flores, and Kawunda were arrested at the scene, law enforcement seized two cell phones, one that was found in the possession of White and the other that was in Kawunda's possession. Kawunda later testified that he did not have his phone with him during any of the events in question and instead was using Flores' phone. Law enforcement also found a blue latex glove on White.

### (g) Search of Jetta and Jetta
### Chain of Custody

The white sedan that law enforcement had been in pursuit of was a Jetta with a missing gas cap and a missing hubcap. Over White's counsel's objection, the State adduced evidence that 7.62×39-mm ammunition casings, as well as a blue latex glove, were found in the trunk of the Jetta. White's counsel's objection renewed a pretrial motion in limine on lack of foundation due to an alleged break in the chain of custody.

White's foundation objection revolved around the fact that the Jetta had been released to a car dealership for 2 weeks before being reimpounded to conduct the search that finally led to the discovery of the casings and the glove. In overruling the objection, the trial court reasoned that chain of custody went to the weight of the evidence, rather than its admissibility.

At trial, Lt. Owen Gregg testified he responded on June 17, 2021, to a call about a stolen vehicle and was involved in the apprehension of White, Flores, and Kawunda on the bridge near Southside Terrace. Gregg testified he stayed with

the Jetta on the bridge until another officer could arrive to complete the "hands off tow" of the Jetta. Gregg testified a "hands off tow" "means officers are not supposed to touch or disturb anything in the vehicle, and it's held in a secure facility until an investigating unit can do what they would like with it."

Initial searches of the Jetta did not find anything of significant evidentiary value. Sgt. Zachary Petrick, who was assigned to the robbery unit of the Omaha Police Department in June 2021, testified over defense counsel's continuing chain of custody objection that, on June 18, 2021, he and another officer went to the police impound lot, where the Jetta had been towed, to search the Jetta. Petrick explained he could not fully search the trunk because the battery was dead and there was consequently no way to open the trunk without damaging it. Kimberly VanDenAkker, a criminologist, testified she processed the Jetta on July 2 at the City of Omaha impound lot, checking it for prints and DNA in relation to a felony assault. The Jetta was in an outdoor fenced area that was locked. She could not open the trunk.

Det. Jordan Brandt explained that during the first two searches, law enforcement had not yet connected the Jetta robbery or the Scion theft to the shootings and were investigating a carjacking. He expressed frustration with the lack of communication between the different divisions of law enforcement, which led to that error. A search of a car for a stolen car investigation is treated differently from a search for a homicide investigation. As a result of failing to identify the Jetta as the subject of a homicide investigation, on July 2, 2021, the Jetta was released by the assault or robbery unit and, on July 26, towed to the dealership that had repossessed it from Jacinto Franco.

At the dealership, the Jetta stayed on a large lot that was surrounded by fencing with a locked gate. The only exception to the Jetta's being housed on the dealership lot was the last day it was in the dealership's possession, August 9, 2021. On

August 9, the Jetta was towed to the dealership's mechanic's shop. A mechanic took it for two test drives, one around 3 p.m. and the other around 4 p.m. The Jetta then remained parked in front of the mechanic's shop until it was towed back to the police impound lot at around 7 p.m. At the hearing on the motion in limine, Brandt acknowledged he had not interviewed two other employees who had access to the keys to the gate's lock. Nor had he discussed with the mechanic the procedures, if any, for limiting key access to the locked lot.

With the Jetta finally identified as part of a homicide investigation, on August 12, 2021, forensic technician William Talacko searched the Jetta. Though the battery was still dead, Talacko persevered in his attempts to open the trunk, where he found the latex glove and four fired 7.62×39-mm rifle ammunition casings.

No weapons were ever found. However, ballistics analysis determined the casings in the Jetta were from ammunition fired in the same weapon as the 7.62×39-mm casings found at the Spencer East shooting. DNA testing concluded that Kawunda could not be excluded as a major contributor to the mixture of two individuals' DNA detected in the glove, but White and Flores were excluded.

At trial, defense counsel cross-examined Brandt about the Jetta's being out of police custody for 2 weeks. Defense counsel also emphasized at trial that, before the search following reimpoundment, "there was a driver in that Jetta, driving it around."

### (h) Surveillance Footage and
### Objections to Police

Jackson testified at trial to lay foundation for the admission of surveillance videos taken from security cameras near locations connected with the crimes between June 16 and 17, 2021. He also identified the occupants and described certain moments depicted in the videos. Much of the video footage was grainy or taken at odd angles, making certain details hard to see.

The videos were entered into evidence without objection and played for the jury. Jackson explained that he and other law enforcement officers had canvassed the areas of the Hanks and Spencer East shootings to obtain any surveillance video. Jackson testified, without objection, that video from the Spencer East location at the time of that shooting indicated that a white Jetta was a "suspect vehicle lead."

### (i) Hanks Location

In relation to footage from the Hanks location, Jackson testified that law enforcement was looking for "any vehicle fleeing down Ames [Avenue]," going at a "high rate of speed." Jackson testified, without objection, that he was able to identify a vehicle consistent with a white Jetta. No red vehicles were identified as being at the scene of the first shooting; nor was any red vehicle seen in the surveillance footage.

During pauses of the video footage that was played for the jury, Jackson elaborated, without objection, on the locations being shown and where the surveillance cameras were located. During such pauses, without objection, he also testified as to some observations of what the footage showed. Thus, Jackson testified that, shortly before the Hanks shooting, a white Jetta was captured by surveillance cameras traveling eastbound on Ames Avenue. Soon thereafter, it was shown traveling westbound on Ames Avenue, passing by the Hanks parking lot when shots were first detected. After those shots were fired, the Jetta continued westbound, which is the direction of Spencer East.

### (ii) Southside Terrace Location
### Before Shootings

Jackson also laid foundation for the admission, without objection, of video surveillance from Southside Terrace in the early morning of June 16, 2021, before the shootings. He explained their investigation focused on Southside Terrace after they learned of the pursuit there on June 17 involving a

white Jetta, which ultimately resulted in the arrest of White, Flores, and Kawunda, who were in the Jetta. Jackson testified without objection that the Jetta matched the "distinguishing characteristics" of the suspect vehicle at Spencer East, noting the missing gas cap and hubcap. Jackson testified that White lived at Southside Terrace at that time.

The Southside Terrace videos were played for the jury. During pauses, Jackson testified, without objection, that the footage showed a vehicle that looked like a white Jetta with a missing gas cap and two people eventually exiting the vehicle. In none of the other videos were the occupants visible.

Before Jackson testified further to identify who exited the vehicle, White's counsel objected, renewing a motion in limine concerning police testimony about surveillance videos, which motion the court had overruled. The motion had asserted that officers who were not firsthand eyewitnesses to the events depicted in the videos should not be able to explain to the jury what they believed the videos depicted. It also asked that the officers not be permitted to identify the individuals portrayed in the videos.

In the motion in limine, White's counsel argued such testimony was inadmissible lay testimony under Neb. Rev. Stat. § 27-701 (Reissue 2016) and more unfairly prejudicial than probative under Neb. Rev. Stat. § 27-403 (Reissue 2016). The State responded that the officers' knowledge of the areas in question would assist in the jury's ability to understand what was being depicted; further, the officers should be allowed to identify the people depicted in the videos based on their familiarity with their characteristics and what they were wearing when arrested.

The court overruled the objection to Jackson's testimony at trial, which objection defense counsel asked to be continuing. Jackson then testified that the two people seen on surveillance footage exiting the Jetta in Southside Terrace before the shootings were White and Flores. Jackson noted their unique clothing that became important to law enforcement

later in their investigation. Photographs on White's phone, time-stamped June 16 and June 17, 2021, and entered into evidence at trial, showed White and Flores wearing the same clothing they were wearing in the surveillance footage.

Jackson testified that the surveillance video in Southside Terrace before the Hanks shooting next showed White and Flores exiting a building. From there, White and Flores entered a sports utility vehicle (SUV) with multiple individuals. White and Flores were driven in the SUV the short distance to where they had parked the Jetta. About 30 minutes before the Hanks shooting, White and Flores got into the Jetta and drove away, with the SUV following. Hanks was about 10 minutes away by car, traveling at the speed limit.

### (iii) Spencer East Location

During pauses while playing for the jury surveillance footage from Spencer East near the time of the shooting, Jackson testified that a white Jetta with a missing gas cap could be seen driving through the parking lot of Spencer East, passing where Johnson was parked in his vehicle, and eventually leaving the camera's view. Another video from Spencer East showed a person Jackson identified as Kawunda, along with another individual, emerging from the corner of a building adjacent to where Johnson was sitting in his vehicle in the parking lot. Jackson testified that the video next captured several muzzle flashes from Kawunda's location. Jackson testified that Kawunda and the other individual appeared to be shooting in Johnson's direction.

### (iv) Southside Terrace Location
### After Shootings

More surveillance video recorded after the Spencer East shootings and played for the jury showed that the Jetta returned to Southside Terrace. As Jackson described, four occupants exited the Jetta, leaving it to roll into another vehicle while they ran toward a building. The four then ran back toward the

Jetta with an additional person, and all five got into the Jetta. Subsequently, the five individuals exited the Jetta, separated into two groups, and eventually met back up on the other side of a building. Among those five individuals, Jackson identified White, Flores, and Kawunda.

### (v) Phone Location Data and Photographs

The location data from White's phone was entered into evidence at trial. It showed that, in the early morning hours of June 16, 2021, White traveled near an apartment complex in a Crips neighborhood before stopping at a known "Trip set" gang member's address. Brandt testified that Kawunda was a known member of the Trip set gang, which he described as a "sect[]" of the Bloods.

White then proceeded to Hanks, where his phone location showed him to be when ShotSpotter detected gunfire. After the Hanks shooting, White's phone took a convoluted route toward the Spencer East housing project. White's phone was at Spencer East when ShotSpotter detected the second shooting. White's phone was also detected near the west Omaha gas station when the Scion was stolen.

White's and Flores' phones contained photographs taken between June 13 and 17, 2021, which were entered into evidence at trial. Additionally, White's phone contained relevant videos and Flores' phone contained text message conversations that occurred during the relevant time period, which videos and messages were entered into evidence.

In a short video recording on June 15, 2021, White was in the front seat of the Jetta and Flores was in the back. White says at the end of the video, "'Fuck the ops.'" Brandt testified that, from his experience as a police officer, including in the gang unit, "ops" are "[n]eighborhoods that [gangs or their members] feud with, other groups that they feud with."

Brandt stated that in one photograph from June 15, 2021, found on White's phone, White is in the front passenger seat of the Jetta, displaying a gang sign. He is pictured wearing

the same clothing he was wearing in the surveillance videos. In a second photograph from that date on White's phone, Flores is pictured also "throwing up a gang sign." Brandt recognized from the background that Flores was in Southside Terrace. A third photograph shows Kawunda in the driver's seat of the Jetta. Other pictures show Flores and Kawunda in the Jetta.

White's counsel objected on relevance and § 27-403 grounds to the admission of photographs and text messages from Flores' phone. Counsel's motion was in relation to the pretrial motion to sever White's trial from Flores' trial, which the court had denied. The court overruled the objection.

The text message conversation on Flores' phone was between Flores and his brother on June 14, 2021. The brother asked Flores, "'Where y'all at?'" Flores responded that he was on his way. Close to 1 a.m. on June 16, the messages indicate Flores was on his way to meet up with his brother, and at around 1:30 a.m., Flores texted, "[The] Boys [are] haf," indicating, according to Brandt, that the "police are out." He then texted, "Can't do it" before a series of further messages.

A video from Southside Terrace around that time showed the Jetta with a police cruiser behind it. Later the same morning, Flores sent a text message to his brother asking him to "[c]heck [an] Omaha scanner."

A photograph on Flores' phone from June 17, 2021, shows the Scion's steering wheel. Another photograph from June 16 shows Flores in Southside Terrace. In the photographs, Flores was wearing clothing consistent with that depicted in the surveillance videos.

(i) Kawunda's Testimony

In his testimony at trial pursuant to his plea agreement, Kawunda confirmed the evidence demonstrating the series of events that began with the robbery of the Jetta and ended with White's, Flores', and Kawunda's apprehension on a bridge near Southside Terrace. Kawunda testified that he, White, and

Flores were "always together" during the days between June 13 and 17, 2021. He described that they were on the run during that period and slept in the Jetta. Kawunda confirmed that throughout that period, they took pictures of one another on White's and Flores' phones.

Kawunda testified that on June 13, 2021, at the swimming pool, White told him to rob Jacinto Franco and then discreetly handed Kawunda a gun. Kawunda described the gun as a "1911, 45 caliber." Kawunda confirmed that once they had stolen the Jetta, they went back to Southside Terrace. Kawunda identified White and Flores in the surveillance video exiting the Jetta in Southside Terrace before the shootings.

Kawunda testified that he, White, and Flores drove from Southside Terrace to Hanks. Kawunda was the driver and was still carrying the 1911 gun. Kawunda explained they wanted to shoot at Crips because Crips were their rivals.

Kawunda could not recall if White had a firearm but testified that Flores had a "7[.]62 rifle." According to Kawunda, another party was in the car and carried a .38-caliber revolver.

Kawunda explained that they passed Hanks going one direction, saw the group of people there, made a U-turn, and, coming back the other direction, started to shoot. They were not targeting any particular person, just Crips.

Kawunda witnessed someone being shot, who Kawunda later discovered to be Washington. Kawunda testified that he, White, Flores, and Marion Harris all claimed responsibility for shooting Washington.

From Hanks they went to Spencer East, where a "known crowd of Crips hang out." They saw somebody in a parked vehicle who they thought might be a Crips member. They parked and exited the Jetta, and Kawunda and Harris went one direction while White and Flores went another direction.

Kawunda testified that he and Harris took shelter along the outside wall of a Spencer East apartment building and shot at the vehicle with Johnson inside. Kawunda stated that White and Flores were also going to shoot, but that he did not know

if they did. Kawunda identified himself in the surveillance video shooting at Johnson from the shelter of an exterior wall of a nearby building.

Kawunda testified that, after the shooting at Spencer East, the group drove back to Southside Terrace in the Jetta. Regarding the incident captured by surveillance video in Southside Terrace when the Jetta rolled into another parked car after the occupants' hasty exit, Kawunda explained they thought they were being fired upon. Kawunda identified White and Flores in surveillance video exiting the Jetta after they again parked.

Kawunda testified that, in the early morning hours of June 17, 2021, he, White, and Flores traveled in the Jetta to west Omaha, where they stole the Scion. Kawunda was the one who got into the Scion and drove it away, while White was driving the Jetta. Kawunda testified they went to that area of the city because they considered it an easier place to steal vehicles, stating, "[P]eople leave their cars running out west." Kawunda testified the idea of stealing the Scion was "[a]ll of [theirs]." They wanted to have a second vehicle.

According to Kawunda, he, White, and Flores then proceeded back to Southside Terrace. Later that day, while driving around in Southside Terrace in the Scion, they noticed they were being followed. When they saw law enforcement arrive, the three of them ran to the Jetta and drove off. Kawunda was driving. After running into a police cruiser, they continued to the bridge, where they became trapped and were apprehended.

## 5. JURY INSTRUCTIONS AND VERDICTS

The court gave the jury 28 instructions. The court instructed the jury numerous times throughout its instructions that the jury must "separately consider the 11 crimes charged."

In instruction No. 16, the court told the jury it must also separately determine White's and Flores' guilt. The court instructed: "[T]wo defendants are on trial here, each charged

with more than one crime. You must come to a separate deci-
sion regarding each crime. In the same manner, you must come
to a separate decision regarding each defendant."

Instruction No. 15 described aiding and abetting for the jury
as follows:

> [White] can be guilty of a crime even though he
> personally did not commit every act involved in the crime
> so long as he aided someone else to commit it. [White]
> aided someone else if:
>
> (1) [White] intentionally encouraged or intentionally
> helped another person to commit the crime; and
>
> (2) [White] intended that the crime be committed; or
> [White] knew that the other person intended to commit
> the crime; and
>
> (3) The crime in fact was committed by that other
> person.

The court refused White's proposed jury instruction that
differed from instruction No. 15 by adding that "[e]vidence
of mere presence, acquiescence, or silence is not enough to
sustain the State's burden of proving [White] guilty." White's
proposed instruction stated:

> [White] can be guilty of a crime even though he
> personally did not commit every act involved in the crime
> so long as he aided someone else to commit it.
>
> [White] aided someone else if:
>
> 1. [White] intentionally encouraged or intentionally
> helped another person to commit the crime; and
>
> 2. [White] intended that the crime be committed; or
> [White] knew or expected that the other person intended
> to commit the crime; and
>
> 3. The crime in fact was committed by that other
> person.
>
> Evidence of mere presence, acquiescence, or silence
> is not enough to sustain the State's burden of proving
> [White] guilty.

The jury returned verdicts against White of guilty on all 11 counts.

## III. ASSIGNMENTS OF ERROR

On appeal, White assigns that the district court erred by (1) denying his motion to sever the theft charges from the other charges, (2) denying his motion to sever his trial from the trial of his codefendant Flores, (3) denying his motion in limine to exclude evidence for which the State had failed to maintain a chain of custody, (4) denying his motion to exclude improper opinion evidence regarding the content of surveillance videos, and (5) declining to adopt his proposed instruction that his mere presence was inadequate to sustain a guilty verdict.

## IV. STANDARD OF REVIEW

[1] A denial of a motion to sever will be reversed only if an abuse of discretion is shown that caused the defendant substantial prejudice amounting to a miscarriage of justice.[1]

[2] Our review concerning the admissibility of physical evidence, including foundation and chain of custody issues, is for an abuse of discretion.[2]

[3] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[3]

[4] To establish reversible error from a court's refusal to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[4]

---

[1] See *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025).

[2] See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

[3] *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[4] *State v. Haynie*, 317 Neb. 371, 9 N.W.3d 915 (2024).

## V. ANALYSIS

On direct appeal, White contends that the district court erred by overruling his motions to sever the theft and robbery charges from the other nine charges and to sever his trial from the trial of his codefendant Flores. He also argues the court erred by refusing to exclude the evidence found in the trunk of the Jetta and Jackson's testimony during the surveillance videos. Lastly, White asserts the district court erred because it did not add his requested language to the jury instruction on aiding and abetting. We address each of these arguments in turn.

### 1. Joinder of Offenses

[5,6] We find no error in the district court's order denying White's motion to sever the theft and robbery charges from the remaining nine charges against him. A clear presumption exists in favor of a joinder of offenses and against severance.[5] The joinder or severance of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016), which expresses a rule of liberal joinder of offenses to achieve judicial economy and is construed broadly in favor of joinder.[6] Section 29-2002 states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order

---

[5] *State v. Corral, supra* note 1.

[6] *Id.*

> an election for separate trials of counts, indictments, informations, or complaints . . . or provide whatever other relief justice requires.

Thus, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.[7]

### (a) Properly Joinable

[7] The June 13, 2021, Jetta robbery and June 17 Scion theft were properly joinable because they were connected with the shootings and part of White, Flores, and Kawunda's common scheme or plan to shoot Crips. The terms "connected together" or "part[] of a common scheme or plan" in § 29-2002(1) usually come into play when offenses are committed over a period of time and in some way reasonably connected, with the "common scheme or plan" element focusing more on the motivation behind the crimes and the "connected together" element focusing more on the time-space relationship.[8] Whether offenses are sufficiently connected together or part of a common scheme or plan involves consideration of the totality of the circumstances weighed in light of broadly construing permissive joinder to promote trial economy and judicial efficiency.[9]

Recently, in *State v. Sawyer*,[10] we affirmed the joinder of two charges against the defendant, each pertaining to a different driveby shooting in the same general area of Omaha 3 days apart. We observed similarities between the two shootings and their common scheme or plan to avenge a murder.[11]

---

[7] See *id.*

[8] See *id.*

[9] See *id.*

[10] *State v. Sawyer*, 319 Neb. 435, 22 N.W.3d 650 (2025).

[11] See *id.*

While we have not had occasion to address stolen vehicles before or after a shooting, other jurisdictions have. In *Ex Parte Scott*,[12] for instance, the court held that a getaway car stolen shortly after a murder was part of a common scheme or plan and that therefore, a theft charge was properly joined with the murder charge. Similarly, in *State v. Taylor*,[13] a charge of murder was properly joined with two robbery counts where the murder occurred as part of a plan to steal the murder victim's vehicle for use in the subsequent robberies.

[8] White points to the lack of direct evidence that he, Flores, and Kawunda discussed any intent to steal cars as part of any overarching plan or scheme. But such direct evidence is not necessary. To be part of a common scheme or plan, it is not necessary that all the crimes were specifically contemplated before any one of them was committed; it is sufficient if the related crimes developed as events unfolded and in furtherance of the group's objectives.[14]

Considering the totality of the circumstances, it is reasonable to infer a meaningful relationship between the initial robbery of the Jetta, the two subsequent shootings, and the theft of the Scion. It would have been difficult to conduct the shootings without a vehicle. And procuring a different vehicle after the shootings would facilitate a plan to flee or hide.

We reject White's suggestion that the period from June 13 to June 17, 2021, was too great a separation in time or that the locations of the robbery and theft were too far from those of the shootings or each other to permit all 11 crimes to be "connected together" as contemplated in § 29-2002(1). As Kawunda testified, he, White, and Flores were "always together" during the days between June 13 and June 17, when they were on the run as part of their scheme to shoot Crips. The crimes were joinable.

---

[12] *Ex Parte Scott*, 728 So. 2d 172 (Ala. 1998).

[13] *State v. Taylor*, 364 Or. 364, 434 P.3d 331 (2019).

[14] See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

### (b) Compelling, Specific, and
### Actual Prejudice

[9] If two or more offenses are properly joinable, courts must next determine whether joinder would be prejudicial to the defendant.[15] Under § 29-2002(3), even if prejudice is shown, the determination as to any remedy that may be necessary is left to the sound discretion of the district courts.[16] A defendant opposing joinder must meet a high burden of proving prejudice therefrom by showing compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.[17] This is not merely a better chance of acquittal in separate trials or spillover of evidence from one count to another, but an appreciable chance that the defendant would have had for an acquittal in a severed trial.[18]

[10] While prejudice from joinder cannot be shown if the evidence of one charge would have been admissible in a separate trial of another charge, the converse is not true.[19] Cross-admissibility of evidence pertaining to joined charges is only one consideration in determining prejudice.[20] We also consider whether, to the extent not cross-admissible, the evidence for one charge is sufficiently distinct from the evidence of the other charge so the jury can keep the evidence pertaining to each separate, rather than combining evidence of both to find guilt it would not have found in a separate trial.[21]

[11-13] White argues he suffered compelling, specific, and actual prejudice because, pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024), in separate trials on the charges related

---

[15] *State v. Sanders*, 15 Neb. App. 554, 733 N.W.2d 197 (2007). See, also, e.g., *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003).

[16] *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

[17] See *id.*

[18] See *State v. Corral, supra* note 1.

[19] See *id.*

[20] See *id.*

[21] See *id.*

solely to the robbery of the Jetta or the theft of the Scion, evidence of the shootings would not have been admissible and, likewise, in a separate trial of the other nine charges, the car robbery and car theft would not have been admissible. Evidence of other crimes, wrongs, or acts may be admitted under § 27-404(3) where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question.[22] But "inextricably intertwined evidence" is not subject to § 27-404.[23] Evidence that is inextricably intertwined includes evidence that forms part of the factual setting of the crime, is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or is necessary for the prosecution to present a coherent picture of the charged crime.[24] For the same reasons that we found the evidence sufficient to show the Jetta robbery and Scion theft were connected or part of a common scheme or plan to shoot Crips and escape apprehension, we conclude the acquisition of the two vehicles was inextricably intertwined with the other nine charges.

[14] Moreover, limiting instructions often will suffice to cure any risk of prejudice,[25] and the district court instructed the jury multiple times that it must "separately consider the 11 crimes charged" when rendering its separate verdict on each of the crimes. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[26] White points to no evidence, other than that he was found guilty, that the jury did not follow its instructions.

---

[22] *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

[23] *State v. Lee*, 304 Neb. 252, 271, 934 N.W.2d 145, 160 (2019).

[24] *Id*.

[25] See *id.*

[26] *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024).

White has not demonstrated improper joinder of the 11 charges or compelling, specific, and actual prejudice resulting from the joinder of the charges. We turn next to the joinder of White's trial with that of Flores.

## 2. Joinder of Defendants

[15] Joinder of defendants, like joinder of charges, is governed by § 29-2002, and the same general principles governing joinder of charges govern joinder of defendants.[27] There is a preference for joint trials,[28] and White does not deny that he and Flores were properly joined as participants in the same series of acts or transactions constituting the charged offenses. Nevertheless, White argues he suffered compelling, specific, and actual prejudice from the joint trial such that the district court abused its discretion by denying his request that it order separate trials. We disagree.

More specifically, White argues he was prejudiced by the admission of the text messages and photographs on Flores' phone and the "notable difference in culpability and the quality of the State's evidence against Flores as opposed to the quality of the State's evidence against White."[29] On this latter point, White highlights the evidence linking Flores to the rifle used to kill Washington and wound Hunter, asserting there was less evidence connecting White to a weapon, which makes White liable more under an aiding and abetting theory, rather than as the principal. Although White repeatedly asserts in a conclusory manner that this evidence would not have been admissible had the court granted his motion to sever his trial from Flores' trial, he does not set forth any legal authority for that premise.

---

[27] See *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[28] See *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[29] Brief for appellant at 18.

A similar argument was rejected by this court in *State v. Smith*.[30] We reasoned in *Smith* that since the State's theory was that the defendant aided and abetted the shooter, similar evidence would have been admissible in separate trials. Therefore, the defendant was not prejudiced by being joined in a trial of the person who allegedly fired the shots in a deadly gang shooting.[31]

[16] We are unpersuaded that the joint trial with Flores permitted the introduction of evidence inadmissible in a separate trial against White, which introduction was of such a nature as to deprive White of an appreciable chance for an acquittal he would have otherwise had.[32] Furthermore, even when the risk of prejudice is high, "'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'"[33] And the district court clearly instructed the jury in White's trial that it "must come to a separate decision regarding each defendant."

White has failed to show compelling, specific, and actual prejudice from the district court's refusal to grant the motion to sever his trial from Flores' trial. We hold that the district court did not abuse its discretion in denying White's motion to sever the defendants' trials.

### 3. Nonrenewal of Motions to Sever

The State urges this court to adopt a waiver rule requiring the renewal of motions to sever at the close of all the evidence at trial. We accept the State's invitation and now hold that a defendant must renew, at the close of all the evidence, a motion to sever defendants or charges in order to preserve that motion for appellate review beyond plain error. However, we

---

[30] *State v. Smith, supra* note 28.

[31] See *id.*

[32] See *id.*

[33] *Id.* at 869, 839 N.W.2d at 348, quoting *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).

adopt this rule prospectively and do not apply it against White in this appeal.

As the State points out, in *State v. Corral*,[34] we observed secondary authority stating that if a defendant believes there has been a prejudicial joinder of charges, it is not enough for the defendant to file a pretrial motion to sever; the defendant must renew the objection at the close of all the evidence, since the prejudice depends on the evidence presented. In *Corral*, we did not decide the defendant's assigned error based on waiver, however. Similarly, in *State v. Garcia*,[35] we observed as a historical fact that the defendant did not renew his motion to sever charges, but we did not decide the severance question on that ground. As already stated, the same general principles governing joinder of charges govern joinder of defendants.[36]

We agree with those jurisdictions that require renewal of a motion to sever at the close of all the evidence to preserve the error for appellate review.[37] Among other things, this has the benefit that the trial court reevaluates possible prejudice from the joinder in light of all the evidence actually adduced and not just in light of the evidence anticipated to be adduced when the pretrial motion is made. This rule applies prospectively to trials commenced after the date of the release of this opinion.

## 4. Jetta Chain of Custody

We next address White's argument that the court erred by refusing to exclude evidence from the Jetta's trunk. White does not take issue with the testimony that the ammunition casings found in the trunk were of the calibers described. He does not take issue with the fact that the 7.62×39-mm

---

[34] *State v. Corral, supra* note 1.

[35] *State v. Garcia, supra* note 27.

[36] See *id*.

[37] See, e.g., *U.S. v. Chavis*, 296 F.3d 450 (6th Cir. 2002). See, also, Annot., 19 A.L.R.6th 115 (2006).

casings in the trunk were from ammunition fired in the same weapon as the 7.62×39-mm casings found at the Spencer East shooting. Rather, he argues the evidence was insufficient to establish that the casings and the glove were in the trunk of the Jetta when it was towed from the bridge. White asserts the dealership's security measures were "insufficient to maintain the chain of custody for two weeks"[38] and implies the casings could have been nefariously placed in the Jetta while it was in the custody of the dealership. White also repeatedly emphasizes the lack of an explanation as to how the dealership's mechanic was able to test-drive the Jetta, which was otherwise found to be inoperable. White does not explain how this relates to chain of custody, however.

[17] Neb. Rev. Stat. § 27-901 (Reissue 2016) does not impose a high hurdle for authentication or identification,[39] and our review concerning the admissibility of physical evidence, including foundation and chain of custody issues, is for an abuse of discretion.[40] A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.[41] If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of § 27-901(1).[42] Section 27-901(1) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that *the matter in question is what its proponent claims*" (emphasis supplied). Whether there

---

[38] Brief for appellant at 21.

[39] See *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[40] *In re Interest of Kane L. & Carter L., supra* note 2. See, also, *State v. Green*, 238 Neb. 492, 471 N.W.2d 413 (1991); *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982).

[41] *State v. Draganescu, supra* note 39.

[42] *Id*.

is sufficient foundation to admit physical evidence is determined on a case-by-case basis.[43]

[18-20] Important to questions of chain of custody are the nature of the exhibit, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.[44] Considering the dealership's custody to be a missing link, White relies on our proposition that

[w]here objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.[45]

It does not follow that the links in the chain of evidence must be perfect. We agree with legal authority stating it is enough that the State establish the reasonable probability that the evidence was not compromised; after that, deficiencies in the chain of custody go to the weight, not the admissibility, of the evidence:

[T]he chain of custody need not be absolutely perfect. The item need not be continually watched, a hand-to-hand showing is not required, and proof of the exclusion of every possibility that the evidence has been disturbed is not required. . . . Although the party offering the evidence need not rule out all possibility of tampering, the evidence must not leave to conjecture who had it and what was done with it. The chain of custody must strongly

---

[43] *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

[44] See *State v. Apker*, 204 Neb. 577, 284 N.W.2d 14 (1979).

[45] *State v. Weathers*, 304 Neb. 402, 427, 935 N.W.2d 185, 204 (2019). Accord, *In re Interest of Kane L. & Carter L., supra* note 2; *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016); *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014); *State v. Glazebrook, supra* note 43; *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004); *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985); *State v. Stickelman*, 207 Neb. 429, 299 N.W.2d 520 (1980); *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977).

suggest the exact whereabouts of the exhibit at all times, and there must be reasonable assurances that the evidence remained in an undisturbed condition. An advocate for evidence must demonstrate with reasonable probability that no tampering or substitution has occurred.

. . . .

Where reasonable assurances of the evidence's identity and unchanged condition exist or once the exact whereabouts of the evidence are strongly suggested, any defect or imperfections go to the weight of the evidence, not to its admissibility. Thus, even when evidence vulnerable to tampering is involved, once the state has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not the admissibility, of the evidence.[46]

This is consistent with our prior statement that the testimony establishing the chain of custody must be "sufficiently complete" so as to render it "improbable" that the original item has been exchanged, contaminated, or tampered with.[47]

Applying these principles, in *State v. Bradley*,[48] we held that the court did not err in admitting a gun as the purported murder weapon over the defendant's foundation objection raising concerns over its chain of custody. These concerns centered around missing information about the gun's location from the time the defendant asked his associate to retrieve it, that associate's giving it to the defendant's brother, and the gun's recovery by law enforcement. The ballistics expert was unable to positively identify the gun as the murder weapon. We held that the defendant's challenge to the chain of custody "goes merely

---

[46] 32A C.J.S. *Evidence* § 1045 at 84-86 (2020).

[47] *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 11, 554 N.W.2d 769, 776 (1996).

[48] *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

to the weight to be given to the evidence presented rather than to the admissibility of that evidence."[49]

In this case, each link in the chain tracing the possession of the Jetta was established with a reasonable probability that the evidence was not compromised. The Jetta was supervised until it was towed to the police impound lot, where it stayed until towed to the dealership's lot, where it stayed until towed to the dealership's mechanic's shop on the same day law enforcement later had it towed back to the police impoundment lot. At the mechanic's shop, the mechanic took the Jetta for two test drives; otherwise, it was parked directly in front of the shop.

As the district court noted, White's criticism of the dealership's security measures went to the weight of the evidence and not its admissibility. Indeed, White's counsel was able to point out these issues at trial. The court did not abuse its discretion in admitting into evidence the ammunition casings and the glove found in the Jetta's trunk.

## 5. Surveillance Video Testimony

We next address White's argument that the district court erred by denying his motion to exclude "improper opinion evidence"[50] regarding the content of surveillance video. White argues Jackson's testimony describing highlighted moments of the surveillance videos was improper opinion testimony under § 27-701.

White's argument focuses on Jackson's identification of White, Flores, and Kawunda when visible in the videos. He suggests that because Jackson became familiar with White's, Flores', and Kawunda's appearances during his investigation, rather than before the crimes, Jackson was no more likely than the jury to correctly identify them, making Jackson's identification inadmissible under § 27-701. White also argues such

---

[49] *Id.* at 395, 461 N.W.2d at 541-42.

[50] Brief for appellant at 23.

testimony was more prejudicial than probative under § 27-403, but did not specifically assign that the district court erred by denying his motion in limine on § 27-403 grounds. Therefore, we do not address that point.[51]

[21] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[52] The amount of a witness' prior experience that is sufficient for an adequate foundation is left to the discretion of the trial judge.[53] Section 27-701 provides:

> If the witness is not testifying as an expert, [the witness'] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) *helpful* to a clear understanding of [the witness'] testimony or the determination of a fact in issue.

(Emphasis supplied.)

[22] We have accordingly held that lay testimony should be excluded whenever the point is reached at which the trier of fact is being told that which it is itself "entirely equipped" to determine.[54] In such a case, the lay testimony is not helpful. Other courts have explained that for identification lay testimony by a police officer to be admissible, there must be, under the totality of the circumstances, some basis for finding that the officer is more likely than the jury to correctly identify the person or persons in surveillance video; however, no particular factor is necessarily decisive.[55] Thus, it is not necessarily decisive whether the officer became familiar

---

[51] See *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025).

[52] *State v. Anthony, supra* note 3.

[53] *Id.*

[54] *State v. Boppre*, 234 Neb. 922, 952, 453 N.W.2d 406, 429 (1990).

[55] See, *U.S. v. Anderson*, 783 F.3d 727 (8th Cir. 2015); *U.S. v. Mendiola*, 707 F.3d 735 (7th Cir. 2013); *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393 (2016), 401 Ill. Dec. 5. See, also, *State v. Ramos*, 319 Neb. 511, 23 N.W.3d 640 (2025).

with the defendant before or at the time of the recording as opposed to after.[56] Nor is identification testimony necessarily limited to those instances either where the defendant's appearance has changed between the times of the recording and trial or where the recording lacks clarity to render such testimony admissible.[57]

A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[58] We hold that the district court did not abuse its discretion in determining that Jackson's testimony identifying White, Flores, and Kawunda was sufficiently helpful to the jury to be admissible. Jackson was able to spend more time reviewing the videos, which were difficult to decipher, and he was familiar with the defendants' clothing and other distinguishing characteristics when they were arrested.

Even if this lay opinion testimony were not admissible, Jackson's identification was cumulative of Kawunda's testimony identifying White and Flores in the surveillance video exiting the Jetta in Southside Terrace before the shootings, as well as exiting the Jetta at Southside Terrace after the shootings, when it rolled into another vehicle.

To the extent White argues the district court erred in allowing Jackson to describe the movements depicted in the videos, this testimony was based on Jackson's investigation of the crimes and familiarity with the areas in question. Moreover, much of that testimony occurred before defense counsel objected, and thus, any argument under § 27-701 was forfeited.[59]

---

[56] *People v. Thompson, supra* note 55.

[57] *Id.*

[58] *State v. Anthony, supra* note 3.

[59] See *State v. Horne*, 315 Neb. 766, 1 N.W.3d 457 (2024).

### 6. Requested Instruction
### on Mere Presence

[23-25] Lastly, we address White's argument that the district court erred by refusing to adopt his proposed instruction on aiding and abetting, which added that mere presence is inadequate to sustain a guilty verdict. To establish reversible error from a court's refusal to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[60] It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.[61] When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case.[62] An instruction which does not correctly state the law or which is likely to confuse or mislead the jury should not be given.[63]

In *State v. Haynie*,[64] we recently addressed a virtually identical aiding and abetting instruction, which we explained is based on NJI2d Crim. 3.8, and the defendant's argument that the court erred by denying his request to add the language that "'[e]vidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt beyond a reasonable doubt.'"[65] We held in *Haynie* that the district court did not err in refusing the defendant's requested instruction, because the instruction given sufficiently informed

---

[60] *State v. Haynie, supra* note 4.

[61] *First Nat. Bank North Platte v. Cardenas*, 299 Neb. 497, 909 N.W.2d 79 (2018).

[62] *State v. Haynie, supra* note 4.

[63] *Id*.

[64] *Id*. See, also, *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997).

[65] *State v. Haynie, supra* note 4, 317 Neb. at 378, 9 N.W.3d at 921.

the jury that an individual not at all involved in the crime yet at the scene could not be found guilty of aiding and abetting. Furthermore, adding the "'mere presence'" language would only confuse and mislead the jury.[66] We likewise hold here that the district court did not err in refusing White's suggested addition to NJI2d Crim. 3.8.

## VI. CONCLUSION

After considering the matter and concluding that we disagree with White's assignments of error, we affirm White's convictions and sentences.

AFFIRMED.

---

[66] See *id.*